**People of the State of Illinois, Plaintiff-Appellee, v. Eddie Woods, a/k/a Eddie Woods, Jr., Defendant-Appellant.**

**Gen. No. 52,821.**

First District, Fourth Division.

September 10, 1969.

■■■■■■■

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Theodore A. Shapero, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Defendant, Eddie Woods, was charged with the crimes of burglary and attempted rape. After a bench trial, defendant was found guilty of both charges and sentenced to the penitentiary for a term of four to ten years, the sentences to run concurrently. Defendant appeals, contending that he was not proved guilty beyond a reasonable doubt; that the lineup conducted by the police

was so unfair and prejudicial as to have denied him due process; and that prosecutor's misstatement of facts in closing argument constituted reversible error.

Complainant testified that on May 10, 1967, she lived in a second-floor apartment at 6618 South Wabash, Chicago. Her apartment had three rooms, with only one entrance and exit. The building had a common balcony for the four apartments located on the second floor. On that date, at approximately 9:55 p. m., she was home with her 11-month-old son; her husband was at work. A man whom she identified as defendant came to her door. She did not open the door, but conversed with him through a peephole in the door for a minute or two. Defendant told her that she had left her car lights on; she replied that it wasn't her car. Approximately five or ten minutes later, while she was in her bedroom playing with the baby, she noticed the living room curtains blowing, and she heard feet shuffling in the kitchen. The bedroom lights were on; the lights in the other rooms were off. As she started to leave the bedroom, defendant came in and knocked her to the bed. She screamed, asked him not to hurt her, and told him that she was eight and a half months pregnant at the time. He pulled off her undergarments and attempted to have intercourse with her. He did not take off his clothes, but exposed himself. He then grabbed her by the neck and dragged her to the living room. He dragged her back to the bedroom, slapped her on the face and again tried to have intercourse. She continually pushed and struggled to resist him. He asked for money, looked through her dresser, and dragged her to the bathroom. After a struggle, he pushed her into the bathtub and ran out the door. The entire occurrence took about 25 or 30 minutes. She called her parents, and when they arrived, the police were called. Her assailant was approximately 5 feet 8 inches to 5 feet 11 inches, wearing a lightweight jacket, waist length, zipper front, brown pants,

351

a green plaid shirt and had on a cap. She did not remember how much he weighed. Although she saw his face clearly, she did not recall seeing any identifying mark. She was taken to the hospital that evening, and was released from the hospital four days later. Before she went to the hospital, two police officers interviewed her briefly. She gave the first detailed account of the occurrence to two detectives after her stay in the hospital. The police showed her some photographs, but she did not see any of defendant. After the assault, she next saw defendant in a lineup at the police station on May 21. There were five men in the lineup. At the lineup, defendant was wearing the same jacket and trousers as on the night of the occurrence, and the rest of his clothing was of the same style. He did not wear a cap at the lineup. After the lineup, one of the officers showed her defendant's picture in a book. She had looked through that book previously, but had not recognized defendant.

Officer Richard O'Connell of the Chicago Police Department testified that he requested the complaining witness to come to the police station on May 21 to view a lineup. The lineup was composed of five men. Except for one man in the lineup who was forty years old, the others were about the same age and had physical characteristics similar to defendant. Defendant was 6 feet, weighed approximately 180 pounds and was 19 years of age. At the lineup he wore a dark olive green waist length jacket, green shirt, brown trousers, but was not wearing a cap. When the witness first saw defendant, he noticed a small scar on his right cheek.

For the defense, Brenda Foster, 16 years of age and a friend of defendant, first testified that on May 10, 1967, defendant came to her home about 11:00 a. m. and stayed until about 4:00 p. m. Her mother, brother and sister were also there. She then testified that she thought May 10 was a Monday, that actually on May 10,

he came over about 6:30 or 7:00 p. m., and stayed until 8:00 or 9:00 p. m. Her father and sisters were home.

Rita Williams, 15 years of age and also a friend of defendant, testified that on May 10, 1967, defendant came to her home about 11:00 a. m. and left about 6:30 p. m. He then went to Brenda Foster's home and came back afterwards. She and her boyfriend walked defendant to the elevated station about 10:30 or 11:00 p. m. She told defendant to call her when he got home so that she would know that he arrived safely, and he telephoned her about 11:30. Her parents and sister were home on that day.

Defendant testified that on May 10 he went to Rita Williams' home about 10:30 a. m. and stayed until 6:30 p. m. He then went to Brenda Foster's home. Her mother, brothers and sisters were home. He returned to Rita's home about 10:30 p. m. Rita and her boyfriend walked him to the el station. The first time he had ever seen complaining witness was at the lineup, and he was in no way involved in this incident. He weighed 163 pounds and was about 5 feet 11 inches tall. He had a scar $\frac{3}{4}$ to $\frac{7}{8}$ inches long and $\frac{1}{8}$ inch wide on his right cheek bone.

Rita Williams testified in rebuttal for the State that her mother was at home when defendant stopped by the first time.

Brenda Foster testified in rebuttal for the State that her father, brother and two sisters were at home when defendant visited her.

Mary Louise Foster, Brenda's mother, testified in rebuttal for the State that on May 10, 1967, she worked from 4:00 p. m. to 11:45 p. m.; she did not see defendant on that day.

Defendant first contends that he was not proved guilty beyond a reasonable doubt, arguing that the complaining witness' identification of him was not clear and convincing. He contends that the identification was de-

ficient in that the complaining witness, prior to the line-up, was shown a book of pictures, including that of defendant, but was unable to identify his picture, and secondly, she was unable to recall any identifying marks on her attacker, while defendant had a scar on his right cheek.

While defendant's identification must be proved beyond a reasonable doubt, our Supreme Court, in People v. Brinkley, 33 Ill2d 403, 211 NE2d 730 (1965), at pp 405–06, stated:

> "Where the identification of an accused is at issue in a criminal case, we have constantly reiterated the rule that the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made."

In that case, the court held that the identification was sufficient even though the complaining witness had previously failed to identify defendant in a lineup and although certain inconsistencies existed in the testimony of the complaining witness. The means of identification and the opportunity to observe the defendant at the time of the crime are factors to be considered in an identification. People v. McIntosh, 82 Ill App2d 90, 227 NE2d 76 (1967).

In the instant case, we see no reason to disturb the trial court's finding that the identification was accurate. The trial judge specifically stated that he had observed all the witnesses, and found the victim to have been "a very truthful witness" who was "telling a very straight-forward story." The victim had ample opportunity to observe her assailant. She first conversed with him, face to face, through the peephole of her door for a minute or two. Then he was in the apartment nearly

354

twenty minutes, during which time she was engaged in constant struggle with him. The lights were on in the room where most of this struggle took place. While her physical description of the assailant was general, she gave a detailed description of his clothing. In People v. Oswald, 26 Ill2d 567, 187 NE2d 685 (1963), the court held that the failure of the victim to see defendant's face at the time of the burglary would not of itself destroy the identification, where other factors, such as similar clothing, corroborate it. And in People v. Lawrence, 72 Ill App2d 1, 217 NE2d 120 (1966), the court upheld an identification no more specific than the one given here, holding that the description given was appropriate considering the circumstances.

The failure of the victim to identify defendant's photograph does not, of itself, affect the identification. The photograph may not have accurately portrayed defendant. Moreover, an identification ordinarily is based upon animate observation of a defendant in his entirety, rather than an inanimate portrayal of his face. In People v. Arbuckle, 413 Ill 441, 109 NE2d 770 (1952), the court found that a trial judge was not required to disbelieve a victim because he was unable to identify defendant in the police station shortly after the crime was committed.

Nor did the complaining witness' failure to notice defendant's scar destroy her identification. Accord, People v. Carpenter, 71 Ill App2d 137, 217 NE2d 337 (1966). In that case, the scar on the cheek was 2 to 3 inches in length. In the case at bar, the scar was less than an inch long, and only $\frac{1}{8}$ inch wide. While defendant in his argument characterizes the scar as being very prominent, it should be noted that the trial judge, while stating that he had a little astigmatism, was unable to see the scar in the courtroom. Under the circumstances of this crime, the failure of the complaining witness to notice the scar did not weaken her identification sufficiently to create a reasonable doubt of defendant's guilt.

Defendant also argues that the testimony of a sole witness, weighed against his unimpeached alibi, could not warrant his conviction.

Credibility of witnesses and conflicting testimony is for the trial court to resolve, and the fact that defendant had numerical superiority in witnesses does not require belief in his alibi. People v. Jackson, 95 Ill App2d 28, 237 NE2d 858 (1968). Although the complaining witness was subjected to an extensive cross-examination, her testimony was consistent, and the trial court found that it was clear and convincing. On the other hand, defendant testified that Brenda's mother was at her home when he was there on the evening in question, while she testified that she was at work. The trial court did not err in rejecting defendant's alibi.

No negative inference that their testimony would be adverse to the State was raised by the State's failure to call Rita Williams' father and boyfriend.

We find no merit in defendant's next contention that the lineup was so unfair and suggestive as to have deprived him of due process. The lineup at the police station consisted of five men. Except for one of the men, all were fairly close in age. They also had physical characteristics similar to those of defendant. At the time of the lineup, defendant was wearing the same clothes as he wore when arrested. While the victim stated that the jacket and trousers he wore during the lineup were exactly the same as he was wearing at the time of the crime, and that the other clothing was similar, that fact does not make the lineup so suggestive as to deprive defendant of due process. The record reveals clearly that the victim carefully selected defendant at the lineup only after she looked at his face and heard his voice.

Finally, defendant argues that reversible error was committed when the prosecutor, in closing argu-

ment, stated that Brenda Foster had testified that her mother was at home when defendant visited her on the evening in question. Although the witness originally had testified that her mother was home, she then went on to say that she had the wrong day in mind, and that on May 10, her mother was not at home. An improper argument unlikely to have affected the result will not require reversal. People v. Miller, 30 Ill2d 110, 195 NE2d 694 (1964). In the instant case, the misstatement of fact could hardly have affected the outcome of the case since defendant had testified twice that Brenda's mother was present. The case cited by defendant in support of his contention that misstatement of facts by a prosecutor requires reversal, People v. Beier, 29 Ill2d 511, 194 NE2d 280 (1963), is distinguishable from the instant case. The misstatement of fact in that case concerned a key issue.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.