THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CEDRIC NICKS, Defendant-Appellant.

(No. 12034;

Fourth District—November 21, 1974.

John F. McNichols and J. Daniel Stewart, both of State Appellate Defender's Office, of Springfield, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (Jerry Finney, Senior Law Student, of counsel), for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Defendant appeals from a judgment entered on a jury verdict finding him guilty of armed robbery and from a sentence imposed of 12 to 20 years. Defendant raises the following issues: (1) Whether the trial court abused its discretion in not ordering a competency hearing, (2) Whether the trial court erred in not suppressing evidence of the gun, (3) Whether allegedly prejudicial hearsay testimony was improperly admitted, (4) Whether defendant was proven guilty beyond a reasonable doubt, (5) Whether defendant was deprived of a fair trial because of certain prosecutorial closing remarks, (6) Whether defendant's 1964 armed robbery conviction was improperly admitted, and (7) Whether defendant's sentence is excessive.

On April 13, 1972, defendant appeared and informed the court that he had dismissed his attorney. On April 17, 1972, defendant indicated that he was unable to hire an attorney and refused to respond to further questioning by the court. The court then appointed the public defender to represent defendant. On May 17, 1972, after completion of the jury selection process the record reads as follows:

> "The Court: Just a minute, this court isn't recessed yet. Mr. Bennett, there is one matter I want to take up here. Show the jury is out of the courtroom and is excused. I have noticed all day today that this defendant has been trading messages and glances and looks with people on the front row who are returning that. This has been distracting to the jurors and it's taking the attention of the jurors.
>
> Defendant: I will continue to do it until you give me an equal opportunity. My rights have been violated.
>
> &ast; &ast; &ast;
>
> The Court: The record will indicate the attitude of the defendant and the Court will deal with that at the appropriate time."

At the trial Tom Erlenbusch testified that on the evening of March 2, 1972, he was working as a bartender at the Industrial Workers Hall in Decatur, Illinois. He stated that the door buzzer rang and he proceeded to open the door when an individual appeared with a gun in

his hand. The individual then stated to him "I want your money" and "Tom, get the money out of the safe." He stated that he then put money from the safe and cash register into the robber's bag. In the process the robber told the three store patrons to put their hands on the bar and keep them there. At this point the gun held by the robber accidentally discharged. The robber then fled out the back door. He described the robber as weighing approximately 150 pounds, 5′6″ tall, black, and wearing an army fatigue jacket with hood pulled up, a handkerchief over his face, and sunglasses, and stated that none of his face could be seen.

William Leslie Warren testified that he was a customer in the lounge on the evening in question, but that he couldn't identify the robber because his face was too well covered.

Leonard Tappendorf, another customer in the lounge, identified the robber in a similar fashion to that given by Erlenbusch. He also stated that a few days after the incident he viewed a line-up and identified the defendant as the robber. He stated on cross-examination that he was not positive defendant was the robber, that he couldn't see the robber's face, and that he based his identification on height and weight.

Clifford Grunden testified that he was also a customer in the bar on the evening in question and identified the robber in a fashion similar to that given by the other witnesses. He further stated that the lighting conditions in the bar were good and that he could see the robber's skin above the tops of his eyelids to his hair. He stated that he saw defendant at the union hall playing bingo on the day following the robbery and clearly recognized him as the robber. He stated that he also viewed a line-up the following week and clearly identified defendant as the robber. He further stated that he was certain of his identification of defendant because he stared at him constantly during the robbery, because he noticed that the robber had two little knots on his forehead, and because he could see his eyes through the sunglasses when the robber turned to the side.

At this point defense counsel moved to suppress evidence and a hearing was held outside the presence of the jury. Jack Coventry, a Decatur police officer, testified that on March 6, 1972, he talked with Pauline May and David Daker at headquarters. He stated that May was worried about her daughter, Marilyn McKenna, who was going with defendant, and she proceeded to implicate defendant in the union hall robbery. He stated that he then went to 644 East Leafland, Marilyn McKenna's residence, and arrested defendant. The defendant was taken from the premises after May and Daker arrived. He stated that he was told by Daker that the gun used in the robbery was in the house, and such a gun was found in a false ceiling by Officer Brown. He stated that Brown did

not remove the gun and was told to leave it there. He further stated that just prior to the initial finding a phone call was received relating that Marilyn McKenna had just signed a permission to search statement, "It was all so close together—I can't really be positive, but right at approximately the time that the gun was found the call was received, just prior to this * * * because I received the call * * *." He stated that the permission to search was then delivered to the house and the gun was then taken from the ceiling and seized by the officers. Pauline May testified that she went to police headquarters to complain about the suspicious activities of defendant and her daughter. Marilyn McKenna testified that on March 6, 1972, she was at police headquarters and signed a statement consenting to a search of her house. Gerald W. Hunk, a Decatur police officer, stated that the phone call relating that permission to search had been granted was received after the gun was first observed. Gerald Boehm, also a police officer, testified that he observed McKenna sign the permission to search form, and a call was then made from headquarters to the house informing the officers there of the signing. The court then denied the motion to suppress evidence seized at the house, including the gun, stating:

> "Now I am not going to sit here and split hairs with a dueling knife on this time element. Clearly it was all one transaction. Coventry testified that everything happened all together, the finding of the gun, the consent, the call, the whole business * * * the record is quite clear that Marilyn McKenna was down at police headquarters, and the whole matter * * * was under discussion at the time * * * everything is a package here.
>
> * * *
>
> But I do not believe that when the consent emerges as the final bit of a whole set of circumstances that you can say at any precise instant during that period of time that there was or was not a consent * * * at the most we have a matter of forty-five minutes involved here and there is no indication that at any time she ever had any attitude different than go search."

The jury was then recalled and Officer Boehm testified that he accompanied McKenna to her home.

> "Q. Now what did you do, * * * and what did Mrs. McKenna do out at that residence?
>
> A. She took items from the home that—went through the home picking up items giving them to us that were bought with the fruits of crime, with the money.
>
> Q. How do you know that?
>
> A. She stated that.

Mr. BENNETT: I object, Your Honor, as to what Mrs. McKenna said."

The court then overruled the objection and Boehm testified to numerous items taken from the house that McKenna allegedly stated were purchased from the proceeds of the union hall robbery.

Officer Dellert testified that he investigated the union hall robbery and extracted a .38-caliber bullet from the wall. Officer Coventry testified that he arrested defendant at the McKenna residence, and that a later search of the house revealed a .38-caliber pistol containing five shells hidden in a false ceiling. Officer Brown testified that he found the pistol.

Marilyn McKenna testified for the State that she lived at 644 E. Leafland, and that she saw defendant daily. She stated that defendant occasionally slept at her house and had some of his clothes there. She stated that she purchased the gun in question and that defendant had recently oiled and greased the gun for her. McKenna was later recalled as a court's witness and was cross-examined by the State. She then denied pointing out various items of personal property and stating that they were purchased with money taken from the union hall robbery. She also denied making any statements to the police concerning the alleged robberies. She did state, however, that defendant knew the bartender at the union hall, and that around the first part of March she purchased many new items, some of the money used to purchase these items coming from defendant.

At this point the State rested and defense counsel indicated to the court that against his advice he was calling defendant to testify. Defendant stated that he couldn't recall his activity on March 2, 1972, but knew he wasn't around the union hall. He denied committing the robbery, or knowing of the pistol at McKenna's residence, and stated that he has never lived with Marilyn McKenna although he was intimate with her, frequently "associated" with her at her residence, and kept a change of clothes at her house. After defendant's testimony the court admitted evidence of defendant's 1964 conviction for armed robbery over defendant's remoteness objection. The jury then returned a verdict finding defendant guilty of the armed robbery. At a post-trial hearing on June 8, 1972, defendant gave a long colloquy on why he had been denied a fair trial, citing mainly alleged denial of the attorney of his choice.

A hearing in aggravation and mitigation was held on June 12, 1972. Defendant's mother, Dorothy R. Davis, testified that her son has brain damage caused by a car accident at the age of 8. Defendant also testified that he has brain damage and was in the Menard asylum for the crim-

inally insane three times. The trial judge then sentenced defendant to 12 to 20 years imprisonment.

Defendant first contends that the court abused its discretion in not ordering a competency hearing. Section 104—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 104—1) stated:

> "For the purposes of this Article, "incompetent" means a person charged with an offense who is unable because of a mental condition:
>
> (a) To understand the nature and purpose of the proceedings against him; or
>
> (b) To assist in his defense; * * *"

The statute goes on to state that if at any time during the course of the trial and before the pronouncement of sentence the court has "reason to believe" that defendant is incompetent to stand trial, the court shall conduct a competency hearing. The "reason to believe" standard has now been replaced by a "bona fide" doubt standard under the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1). See also *People v. Bender*, 27 Ill.2d 173, 188 N.E.2d 682.

Defendant supports his argument by citing various instances during the course of the trial which should have given the court "reason to believe" defendant was incompetent or should have raised a "bona fide doubt" regarding defendant's competency. Defendant cites defendant's mother's testimony that defendant has brain damage, defendant's own testimony in that regard, defendant's failure to cooperate with his counsel, defendant's problems in securing counsel, defendant's trading messages back and forth with spectators, and defendant's statement after the trial concerning his dissatisfaction with not being able to choose his own counsel.

■■ Whether or not to hold a competency hearing lies within the sound discretion of the trial court. (*People v. Pridgen*, 37 Ill.2d 295, 226 N.E.2d 598.) We note that in the instant case this issue was not raised in the trial court. However, we see nothing in the record or in the cited instances which would indicate that because of a mental condition defendant was unable to understand the nature and purpose of the proceedings against him or was unable to assist in his own defense or which would raise a bona fide doubt in that regard. Nevertheless, the trial judge who observed defendant throughout the course of the trial and heard the testimony of defendant's mother is certainly in a better position to make a decision regarding defendant's competency than is this court, and that discretion was clearly not abused here.

■■ Defendant next contends that the court erred in refusing to sup-

press the gun because it was seized in a warrantless search of the Mc-Kenna residence before consent. We do not agree. McKenna admitted consenting to the search of her house, and after the hearing on the motion to suppress the court specifically found that the consent was obtained from McKenna at approximately the same time that the search was conducted. The testimony of Officer Coventry supports this assertion. The court's decision in this regard is then clearly not against the weight of the evidence. We further note the propriety of third-party consents in situations such as the present one where there was evidence in the record that defendant either lived with McKenna or, at least, as McKenna's paramour, shared the apartment on some type of continuing basis. See *People v. Stacey*, 58 Ill.2d 83, 317 N.E.2d 24.

Defendant further contends that defendant's conviction should be reversed because allegedly prejudicial hearsay testimony was admitted. We do not agree. Officer Boehm testified that he accompanied McKenna to her house in the early morning hours of March 7, 1972. When asked what happened at the residence, Boehm stated that McKenna went through the house picking out items that were purchased with the fruits of the crime. The court then overruled defense counsel's objection as to what McKenna said. Boehm then proceeded to testify that McKenna pointed out various items of personal property which she said were purchased from the union hall robbery. McKenna was later called as a court's witness by the State and substantially denied stating to police that the items were purchased with money taken from the union hall or making any statements whatsoever.

■■ Assuming that these statements by Officer Boehm were hearsay, we find them to be harmless beyond a reasonable doubt when read in the context of the record as a whole. The identification of defendant as the robber by Grunden, a customer in the union hall, was positive and credible. He stated that he could see the robber's skin from the top of his eyelids to his hair, and that he was certain of his identification because the robber had two little knots on his forehead and because he could see the robber's eyes through his sunglasses whenever he turned to the side. He further stated that the lighting conditions were good, and that he stared at the robber through the whole period of the robbery. He also called the police when he recognized defendant as the robber while defendant was playing bingo at the union hall on the evening following the robbery, and clearly identified defendant at a police line-up the following week. His positive identification was corroborated by other evidence. Although his identification wasn't positive, Tappendorf, another customer in the hall, also identified defendant as the robber at a police line-up. Furthermore, there was evidence that defendant knew the

bartender, Erlenbusch, and, indeed, the robber referred to him by his first name. There was also a .38-caliber pistol found in the McKenna residence loaded with five shells and, in fact, a .38-caliber bullet was accidentally discharged by the robber during the course of the robbery. The record shows that defendant was either living with McKenna or, at least, sharing the house on some type of continuing basis. McKenna testified that she saw defendant daily, that defendant occasionally slept there, and that defendant kept some clothes there. Defendant admitted that he was intimate with McKenna, that he frequently "associated" with her, and that he kept a change of clothes at her residence. McKenna further testified that defendant knew of the gun and had recently oiled it for her. Therefore, an examination of the entire record indicates there to be more than sufficient other evidence to sustain defendant's conviction.

■■ Defendant also argues that defendant was not proven guilty beyond a reasonable doubt. We clearly do not agree and refer to our discussion in the previous paragraph. The identification of the robber by Grunden was quite positive and credible, and he had ample opportunity to view defendant under good lighting conditions. It is well established that a positive identification by a single credible witness can sustain a conviction. (*People v. Miller*, 30 Ill.2d 110, 195 N.E.2d 694; *People v. Guyton*, 114 Ill.App.2d 394, 252 N.E.2d 665.) Furthermore, the Grunden identification was corroborated by the other evidence described above. Defendant's testimony was highly unbelievable and partially contradicted in several respects by McKenna. Therefore, we see no reason to disturb the jury verdict, and defendant was clearly proven guilty beyond a reasonable doubt.

■■ During his closing argument the State's Attorney stated:

"We believe that after you have considered all of the evidence in its totality and analyzed the witnesses and their credibility—now when they are up there they have taken an oath to tell the truth, it's for you, the jury, to sort out what the truth is, to determine where it went awry, and who wasn't telling the truth, because there is a truth, and I submit you didn't hear it from the stand when you listened to Marilyn McKenna or Cedric Nicks, and we have presented a case to you in which this defendant did commit this robbery, and we ask you to find him guilty."

Defendant contends that these comments represented the prosecutor's personal belief that defendant was lying, was prejudicial, and denied defendant a fair trial. This argument is without merit. We first note that these statements were not objected to by defense counsel. Nevertheless, there is certainly nothing to prohibit a prosecutor from comment-

ing on matters that are based on the evidence presented at trial. (See *People v. Provo*, 409 Ill. 63, 97 N.E.2d 802.) In the instant case the prosecutor's comment that defendant was lying is clearly based on the evidence. Defendant's testimony was highly unbelievable and contradicted in several respects by Marilyn McKenna.

■■ Defendant next contends that the trial court erred in admitting into evidence for credibility purposes defendant's 1964 conviction for armed robbery. This argument also is without merit. The only objection at trial to this evidence was that of remoteness, yet the conviction here was clearly within the time limitations established by *People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695, and we do not see that any of the other requirements of *Montgomery* are offended by the introduction of this conviction.

■■ Defendant finally contends that the sentence imposed by the trial court of 12 to 20 years for armed robbery is excessive and should be reduced by this court. We do not agree. Armed robbery is always a dangerous crime and in the instant case defendant's gun was discharged, which even though accidental could still have caused great harm. We further note that defendant had previously been declared delinquent and had a prior conviction for armed robbery for which he received a sentence of 2 to 20 years imprisonment, but for which he spent nearly 7 years in prison. Furthermore, the present offense was committed within a year of his parole from that offense. Since armed robbery is a Class 1 felony, a sentence need not conform to the one-third of the maximum ratio mandated for Class 2 and 3 felonies under the Unified Code of Corrections. See Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1, and *People v. Tiffin*, 16 Ill.App.3d 367, 306 N.E.2d 325.

Accordingly, for the reasons stated above the judgment and sentence imposed by the circuit court of Macon county is hereby affirmed.

Judgment affirmed.

SMITH, P. J., and CRAVEN, J. concur.