THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EUGENE FLINT, Defendant-Appellant.

Second District   No. 85—0080

Opinion filed March 14, 1986.

Mary P. Gorman, of O'Brien, Healy, Wade & Gorman, of Rockford, for appellant.

Daniel Doyle, State's Attorney, of Rockford (William L. Browers and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

Following a jury trial, defendant, Eugene Flint, was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)) and sentenced to a 75-year term of imprisonment. He appeals, contending (1) that his identification as one of the perpetrators of the offense was not proved beyond a reasonable doubt, (2) that a mistrial should have been declared on the third day of trial when one of the jurors was dismissed and replaced with an alternate because the remaining jurors knew that the reason for the trial court's action was that one of defendant's relatives had approached the dismissed juror and talked about the case, (3) that in closing argument the prosecutor improperly referred to defendant's failure to present evidence on a certain issue, and (4) that the trial court improperly coerced a verdict by requiring the jury to deliberate into the early morning hours after the jury had twice reported that it was deadlocked.

In the early morning hours of August 28, 1983, an armed robbery took place at the Rainbow Tap in Rockford. In the course of the robbery, Donald Parker, the bartender, and Douglas Block, the son of the tavern owner, were shot. Parker died as a result of his gunshot wounds, but Block recovered. James Beer, a patron of the bar, was also present during the robbery. He hid behind a juke box during the shooting and was not injured. At trial the State called four witnesses whose testimony is relevant to this appeal: Margie Day, a patron of the tavern who left shortly before the robbery; Douglas Block, who identified defendant as one of the robbers; James Beer, who was unable to make an identification; and George Ellis, who saw defendant shortly before the robbery in a car which was linked to the offense.

Margie Day testified that on the night in question she was at the Rainbow Tap with her husband. They were drinking beer, and she was "feeling somewhat the effects" of alcohol. At one point in the eve-

ning, when she and her husband were the only patrons, a black male entered the bar through the back door. He went to the cooler and got a can of beer. He then set it on the bar and paid the bartender. The individual was wearing tight pants, dark in color, and a vest with a chain. Day testified that one of the pants pockets looked like it had "an outline of a gun in it." Day "punched" her husband, but he did not pay any attention to her so she got up and went to the bathroom. When she came back out, the individual had left.

Day testified that a little while later Douglas Block came into the tavern and brought Day her car keys. She had left them in the car. Block told her that he had seen some blacks going through her car. Block subsequently left the tavern for a while. Shortly after he returned, the Days left. When they left, it was a little before midnight, and Block and Parker were the only ones left in the tavern.

Block testified that he was a Rockford police officer, and that he operated a tow truck service when not on duty. On the night in question he was off duty. At about 10:30 p.m. he towed a car at the request of the sheriff's police. When he finished that job, he drove to his father's tavern, arriving at 11 or 11:10 p.m. He parked his tow truck behind the bar. There was one other car parked there.

Block testified that when he entered the tavern, Parker was tending bar. Also present in the bar were Margie Day, her husband, and a black male. Block testified that he walked over to the Days and watched the black male to see what he was looking for. He was looking around, and then left by the back door.

About five minutes later Block heard a noise outside like a car door shutting. He went outside and saw a "black kid" about 16 years old throwing something on the ground near the Days' car. The young man ran away, and Block went over to the car and picked up the Days' car keys. As he was doing so, he heard the noise of a car going over gravel. He looked up and saw a black-over-white Lincoln pull out of a nearby parking lot with its headlights off. There were four or five black people in the car.

When the car was about a block away, Block got into his tow truck and followed it. While he was following the Lincoln, he observed that its left taillight lens was broken out. He also wrote down its license number on a card which was admitted into evidence. The license number was YKA 764. Block said that the rear license plate, which included the expiration sticker, was properly affixed to the back of the car. Block followed the car until the people in it started looking back at him. Then he returned to his father's tavern, arriving at about 11:30 p.m.

When he returned, the Days were the only patrons in the tavern. They left five or 10 minutes later. Block locked the back door behind them, and Parker took the money out of the drawer and began to count it. The front door of the tavern had previously been locked. While Parker was counting the money, there was a knock at the back door. Parker knew the man at the door, James Beer, so Block unlocked the door and let him in for a fast beer.

At about 12:15 a.m., two black men came in the back door and announced a holdup. Block said that the first one who came in was of medium height and build, and was wearing blue jeans with a blue top. He had on a blue handkerchief with polka dots "just underneath the nose area" and was carrying a chrome revolver in his hand. The other robber was also of medium build. He was wearing a shower cap and a "greenish" medical shirt. He had a full beard and a mustache and was carrying a black snub-nose revolver. Block testified that the second man was Charles Richardson.

According to Block, Richardson went behind the bar. The other robber came over to Block and ordered him, Parker, and Beer to put their hands on the bar. He told them they had better do what he said, or he would kill them. Block testified that the man kept asking him if he was a police officer, and Block said he was not. The man said he would kill Block if he found out Block was a police officer.

Block testified that he watched Richardson get the money bag out of the drawer and take the money out of the cash register. The other robber started hitting Block with the gun and told him to keep his eyes straight ahead. Then Richardson asked Parke where the safe was, and Parker told him. Richardson asked Parker to open it, and Parker replied that he did not know the combination. Richardson then told Parker he would kill him if he did not open the safe. Parker and Richardson then started walking down the bar toward the safe. When they got in front of Block, the other robber told Richardson to check out Block's wallet. Richardson, who had previously put his gun down, reached for Block's wallet and flipped it open. Block's police badge was in the wallet.

At that point, Parker grabbed Richardson, Block grabbed the other robber, and a struggle ensued. Block struggled with the other robber for about three minutes. Then he heard a gunshot. Block, who was being hit in the head with a gun, saw Richardson running toward him so he fell to the ground, pretending to be unconscious. The man Block had been struggling with then stuck his gun in Block's ribs and shot him. Block then saw Richardson come out from behind the bar, and both robbers started to run toward the door. Parker grabbed

Richardson's leg, saying something like "you're not going to go," and Richardson shot him in the head. The other robber then jumped over Parker and shot him in the back. The robbers then fled.

Later in the day of the robbery, at 10 a.m., when he was in the hospital, Block was presented five or six photographs by Officer Murphy. Block selected a photograph of Charles Richardson as a picture of the robber who shot Parker in the head. Two days later Block attended a lineup at the Public Safety Building. He again identified Charles Richardson, and he also identified Ray Charles Lambert as "[t]he one that possibly bought the beer." Block stated that on September 27, 1983, he attended another lineup. At that time, he selected defendant as the robber who shot him. Block also identified defendant in court.

On cross-examination, Block stated that during the robbery he focused his attention on the man behind the bar until he (Block) started fighting with the other man. During the struggle, Block's eyeglasses were knocked off.

Block stated that he could not remember Detective Krebbs visiting him at the hospital and showing him a group of photographs at 9:30 p.m. on the day of the robbery. At Richardson's trial, which was held before defendant's trial, Block was informed that Krebbs had showed him a group of photographs, including one of defendant, and that he (Block) did not identify defendant. Block was asked whether he selected a photograph of Aaron Turner and told Detective Krebbs that Turner appeared similar to the robber in complexion and through the eyes. Block replied that he remembered making that statement about a photograph to somebody, but that he did not know the photograph was Turner's.

The testimony of James Beer concerning what occurred during the robbery was substantially the same as Block's. Beer did testify that the man with the shower cap had on a dark waist-length jacket rather than a green medical shirt. Beer stated that he did not see the other robber very clearly. When he heard the first gunshot, Beer got up off of his bar stool, went behind the juke box and crouched down. He did not come out again until he heard Block calling the police on the pay telephone.

Beer stated that he attended a lineup two days after the robbery at which he identified Charles Richardson. Beer also picked out another man that he thought looked "something about the right size, right build" to be the other robber. On cross-examination, Beer acknowledged that he attended a lineup on September 27, 1983, and was unable to identify anyone. Beer was informed later that Eugene

Flint had been in that lineup.

George Ellis testified that on the night in question he went to Lady's Garage shortly after 10 p.m. Ellis knew the owner of the garage and went there quite often to visit with friends. Shortly after Ellis went there, Chuckie Richardson arrived in a black over white Lincoln. Ellis left the garage "pretty near 11:30" p.m. During the time that he was at the garage, the Lincoln left once for a few minutes. When Ellis left, he saw Chuckie Richardson sitting in the car. Ray Charles Lambert was there, and defendant was also standing at the car. Ellis testified that he had not known defendant by name, but that he had seen him around for three or four years. Ellis picked defendant out of a lineup on September 27, 1983, as "the guy I saw at Lady's Garage."

The State introduced evidence that police located the Lincoln by 4:30 a.m. the day of the robbery. The rear license plate had been removed. The front license plate had been wired onto the rear of the vehicle and was tilted so that it would have been difficult to read. Inside the glove compartment of the car was a bail bond slip issued to Charles Richardson, and a city of Rockford vehicle sticker receipt issued to Sharon Paschal, Richardson's sister.

It was based on the evidence recounted above that the jury found defendant guilty of murder. Defendant maintains that said evidence was insufficient to prove beyond a reasonable doubt that he was one of the robbers. We disagree.

■ Doug Block positively identified defendant in a lineup one month after the offense and in court as the robber who shot him. A positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction. (*People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470.) In the instant case Block had such ample opportunity to observe the robber he later identified as defendant when he struggled with the man for three minutes inside the tavern. The fact that the robber wore a handkerchief under his nose would not preclude a reliable identification. (See *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301 (identification of accused reliable notwithstanding the fact that the robber wore a piece of cloth which hung down from the middle of the bridge of his nose to below his jaw where witness said that the robber's face was outlined through the cloth). See also *People v. Nicks* (1974), 23 Ill. App. 3d 443, 319 N.E.2d 524 (witness had ample opportunity to view robber notwithstanding that he wore a handkerchief over the lower part of his face).) Moreover, the fact that Block did not pick defendant's picture out of a photographic array at 9:30 p.m. on the day of the robbery does not de-

stroy the subsequent identifications. In *People v. Woods* (1969), 114 Ill. App. 2d 348, 252 N.E.2d 717, convictions were sustained on the strength of the victim's identification of the defendant although she had previously failed to identify a photograph of him. The court explained:

"The photograph may not have accurately portrayed defendant. Moreover, an identification ordinarily is based upon animate observation of a defendant in his entirety, rather than an inanimate portrayal of his face." (114 Ill. App. 2d 348, 355, 252 N.E.2d 717.)

(See also *People v. Miller* (1975), 31 Ill. App. 3d 115, 333 N.E.2d 264.) Here defendant did not offer the array of photographs Block was shown into evidence, and the reasoning of *Woods* is applicable.

■ Upon oral argument in this court, defendant argued that Block's identification of him is suspect because of statements made by LaVertis Stewart to the effect that he, not Charles Richardson, was the robber who went behind the bar and took the money out of the cash register. Defendant argued that if Block misidentified Richardson, that fact would cast considerable doubt on his identification of him (defendant). The statements of LaVertis Stewart referred to, however, were not introduced into evidence at the trial of this case. They appear in the record of People v. LaVertis Stewart, 2d Dist., No. 85—427, an appeal which was pending in this court at the same time as this appeal. Because the statements were not admitted into evidence at the trial here, we may not consider them in determining whether defendant was proved guilty beyond a reasonable doubt. In *People v. Amore* (1938), 293 Ill. App. 505, 13 N.E.2d 105, *aff'd* (1938), 369 Ill. 245, 16 N.E.2d 720, the defendants were convicted of conspiracy to violate the election laws. On appeal they argued that they were not proved guilty beyond a reasonable doubt, and in support of that argument they cited testimony from another case pending in the appellate court in which they were found guilty of contempt of court. The appellate court refused to consider that testimony, stating, "Of course, none of the evidence adduced in that case [the contempt case] was before the jury in the instant case, and cannot be considered here." (*People v. Amore* (1938), 293 Ill. App. 505, 509, 13 N.E.2d 105.) More recently, in *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644, the defendant was convicted of murder. On appeal he contended that he had not been proved guilty beyond a reasonable doubt, and in support he cited certain prior inconsistent statements made by one of the State's witnesses at the preliminary hearing. The statements were not introduced at trial. The appellate court refused

to consider them, stating, "Despite the fact that they are before this court as part of the record on appeal, we may not consider such statements since they are *dehors* the trial record." (46 Ill. App. 3d 978, 988, 361 N.E.2d 644.) The case of *People v. Richardson* (1985), 139 Ill. App. 3d 598, 487 N.E.2d 716, cited by defendant, is distinguishable. There we considered the statements of LaVertis Stewart, which were not introduced in Richardson's case, not on the issue of whether Richardson was proved guilty beyond a reasonable doubt, but on the issue of whether his sentence should be reconsidered below. *Cf. People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344 (in sentencing, courts are not limited to considering information which would be admissible under the adversary circumstances of a trial).[1]

Moreover, the conviction of defendant was not based solely on Block's identification. Defendant was seen in the company of Charles Richardson about 45 minutes before the robbery, and Richardson was identified by both Block and Beer as one of the robbers. Furthermore, there was strong circumstantial evidence that at the time defendant was seen with Richardson, the latter had just returned to Lady's Garage from the Rainbow Tap, which he and his companions had cased in preparation for the robbery. Under these circumstances defendant's guilt was shown beyond a reasonable doubt. See *People v. Nicks* (1974), 23 Ill. App. 3d 443, 319 N.E.2d 524.

■ We next consider defendant's argument that a mistrial should have been declared when one of the jurors was dismissed and replaced with an alternate because the remaining jurors knew that the reason for the trial court's action was that one of defendant's relatives approached the juror who was dismissed and talked to him about the case. On the third day of trial, prior to the reception of any evidence, the trial judge asked the jurors whether they had had any problems. One of the jurors, David Johnson, stated, "I was approached by someone this morning at work—." At this point the trial judge interrupted Johnson and directed him to come into chambers for a discussion outside the presence of the other jurors.

In chambers Johnson told the court that he had been approached at work by a person named Sylvia Sledge who said to him, "You're on a jury on a case." She told him she was defendant's cousin. Johnson told her he could not talk about the case, and she said she would not

---

[1]Although we may not consider the statements of LaVertis Stewart in assessing the sufficiency of the proof on direct appeal, our decision does not bar defendant's use of this evidence in a post-conviction proceeding. *People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 68, 98 S. Ct. 1622.

ask him about it. Johnson told the judge that he had to work with Sledge everyday, and that he would hate to have to explain a verdict to her. Johnson also said, "I don't want to put myself or my family on the spot, you know, getting calls or anything just because I'm doing my duty, you know, and I'm saying now I'd rather not be involved in a situation where people know me." The juror was sent back into the courtroom and a discussion took place between the judge and the attorneys.

The judge said he believed that Johnson felt intimidated in some way. Defense counsel responded that he wanted the juror to remain on the case, and that he believed the juror could disregard the matter in his deliberations. The judge said he would dismiss the juror over defendant's objection. Before doing so, however, the trial judge called juror Johnson back into chambers to inquire whether he had told the other jurors about the matter. Johnson said that he had. The judge asked him what he told the other jurors, and Johnson replied that he told them, "I think I've got a problem. Somebody at work talked to me about—somebody at work was related to the defendant." Johnson said, "[T]hat's the extent of what I said to the other jurors." Johnson was then returned to the courtroom again. Before leaving chambers, defendant made a motion for mistrial based on the anticipated dismissal of the juror. He argued that the dismissal would send a message to the remaining jurors that there was "something of substance" to the encounter between defendant's relative and Johnson. That motion for mistrial was denied, and the parties in chambers returned to the courtroom.

Upon their return,, the judge informed the jurors that juror Johnson had stated that he worked with a relative of defendant, and that "it might cause him some problems, some embarrassment and so forth with regard to any decision that he might make at the close of the case." Juror Johnson was thereupon dismissed. The trial judge asked the remaining jurors whether the matter caused them any problem or concern. No one responded, and the trial resumed.

In our judgment, the trial judge properly denied the motion for mistrial. This case is similar to *People v. Bolla* (1983), 114 Ill. App. 3d 442, 448 N.E.2d 996. In *Bolla*, the defendants were on trial for aggravated kidnaping and conspiracy to commit theft. After the jury was impaneled, one of the jurors, Mrs. McGhee, told the judge *in camera* that she was worried because Bolla knew where she worked, and because she thought her son might have had problems with Bolla's father. McGhee had told the other jurors that she believed one of the defendants recognized her. The judge denied a motion to excuse her

for cause, and the trial was resumed. Three days later the prosecutor told the judge that a car belonging to McGhee's son had been "shot up" the previous day. Following a second *in camera* interview, McGhee was excused and replaced with an alternate juror. The court sequestered the jury following this incident.

On appeal, Bolla argued that he was denied a fair trial because, based on these circumstances, the remaining jurors could only have concluded that McGhee was excused because of fear for her safety, and that he was connected with that fear. This court disagreed. We noted that the burden of showing that a juror has a disqualifying state of mind is on the party challenging the juror (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705), and that the qualification of a juror is a factual determination which the trial judge must make on the evidence, and that the mere suspicion of bias or partiality is not evidence which is sufficient for a finding of disqualification. (*People v. Hyche* (1979), 77 Ill. 2d 229, 396 N.E.2d 6.) We also noted that the remaining jurors did not know that McGhee's son's car was shot up, and we concluded that as far as they knew, any connection between juror McGhee's dismissal and the defendant was speculative.

In the instant case juror Johnson told his fellow jurors only that he had a problem because he had been approached at work by a relative of defendant who talked to him about the case. They were told by the judge that this might cause Johnson some embarrassment. Although in chambers Johnson indicated that he felt some intimidation, this fact was never disclosed to the other jurors. As in *Bolla,* we believe that, from the perspective of the remaining jurors, any connection between the dismissal of the juror and possible intimidation from the defendant appears very speculative. In fact, the remaining jurors were asked whether the matter caused them any problem or concern, and they did not respond. Under these circumstances, the trial judge properly denied the motion for mistrial.

■ We next consider defendant's contention that in closing argument the prosecutor improperly referred to defendant's failure to present evidence on a certain issue. Defense counsel, in his closing argument, maintained that Block's identification of defendant was not sufficiently reliable to find defendant guilty. He stressed the fact that the perpetrator wore a mask during the robbery, and that Bock had failed to pick defendant's picture from an array of photographs on the day of the offense. He concluded by saying, among other things, "Had Mr. Block not waited 30 odd days to identify this man [in the lineup], I would simply bow to my esteemed colleague [the prosecutor] and say you win." It was the prosecutor's response to that comment which

defendant maintains was improper.

In response the prosecutor argued that the reason for the delay in holding the lineup was that defendant was not available. The following colloquy then occurred:

"MR. WASHINGTON [defense counsel]: Oh, objection. There's no evidence he was not available.

MR. GEMIGNANI [the prosecutor]: That's right.

\* \* \*

THE COURT: Just a minute. The jury will recall the evidence as they heard it from the witness stand.

MR. GEMIGNANI: There is no evidence that he was available and there is no evidence that he was not available. Either way. But you can bet if there was evidence that he was available, he'd have put it on.

MR. WASHINGTON: Oh, objection. Move that it be stricken.

THE COURT: Objection sustained. That last comment will be stricken."

Defendant contends that this argument of the prosecutor violated his right to remain silent and "the prohibition against \* \* \* commenting on the failure of the defendant to call witnesses or to present evidence in his own behalf." We need not determine the propriety of these remarks, nor discuss whether they were invited by defense counsel because, in our judgment, if they were improper, the trial judge cured the error by striking the argument.

Although the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court, the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) Defendant contends that the action taken by the court was insufficient here because the reason for the delay in the lineup was a critical issue for the jury. He maintains that the jurors "made an inquiry of the judge concerning why certain witnesses did not testify and requesting information about the police report involving the lineup." That statement is not supported by the record. The only reference to this matter in the record is in defendant's post-trial motion and in the court's ruling on that motion. In the post-trial motion defendant alleged that the court had erred during the deliberations in communicating with the jury about "police reports and the failure of a certain witness to testify." In its ruling on the motion, the court stated, "There were preliminary matters for their

deliberation, certain things that they wanted in the way of evidence, and nothing else went to them other than [what] they had already been furnished and so forth." There is no indication that the evidence the jury requested pertained to the lineup, and we will not assume that it did. In our judgment, the issue of why the lineup was not held for a month was clearly a collateral one which would not have been likely to affect the jury even if the argument had not been stricken. The action of the trial court was sufficient to cure any prejudice from the remarks at issue. See *People v. Sawyer* (1969), 42 Ill. 2d 294, 251 N.E.2d 230, *cert. denied* (1969), 396 U.S. 928, 24 L. Ed. 2d 225, 90 S. Ct. 262; *People v. Harbin* (1975), 31 Ill. App. 3d 485, 334 N.E.2d 379.

Upon oral argument in this court, defendant alleged that the prosecutor's comment regarding defendant's ability to present evidence on the question of his availability for a lineup was made after the court had once sustained an objection to that line of argument. The portion of the record quoted above refutes that contention. The judge had previously admonished the jurors to recall the evidence as they had heard it from the witness stand, but he had not sustained defense counsel's prior objection. In fact, the prior objection was not directed to a comment regarding defendant's ability to present evidence.

■ Defendant's final contention is that the trial court coerced a verdict by requiring the jury to deliberate into the early morning hours after the jury had twice reported that it was deadlocked. The record reveals that proceedings on the final day of trial were begun at about 10 a.m. The jury began its deliberations at 4:25 p.m. At about 9:50 p.m., the jurors sent the trial judge a note stating that they were almost evenly divided, that they were deadlocked, and that they wanted some direction from the court. The judge sent a note back, which stated that they should continue their deliberations. At 11:55 p.m., the court had the bailiff ask the jurors if they were making any progress. They reported that they were not. At 12:20 a.m., the court stated that it intended to call the jury into the courtroom and give it a deadlocked jury instruction in accordance with *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. Defense counsel objected and requested that the jurors be allowed to go home and get some sleep. He suggested that they resume their deliberations the following morning. The objection was overruled, and the jury was called into the courtroom. After the foreman informed the judge that no progress had been made since 9 p.m., and that he did not feel further deliberations would be fruitful, the judge gave the jury a supplemental instruction in substantial compliance with *Prim*. The jury then retired

for further deliberations. At 2:15 a.m. the jury returned its verdict of guilty in open court. The jurors were polled, and each of them confirmed the verdict.

On appeal, defendant does not challenge the language of the supplemental instruction. He argues, however, that it should not have been given at such a late hour after the foreman had indicated that he did not think further deliberations would result in a verdict. He maintains that the jurors were not given any hope that they would be allowed to rest or to leave the courthouse if a verdict was not reached, and that the action of the trial court improperly coerced a verdict. We disagree.

The length of time a jury may be kept together for the purpose of deliberation is a matter peculiarly within the discretion of the trial judge. (*People v. Kinzell* (1969), 106 Ill. App. 2d 349, 245 N.E.2d 319.) In *People v. Latimore* (1975), 33 Ill. App. 3d 812, 342 N.E.2d 209, the jurors told the bailiff at 10:25 p.m. that they did not think they would be able to reach a verdict, and that they would like to be bedded down for the night. The judge did not respond to this request, but he ordered the bailiff to report any further communications from the jury. Nothing further was heard until the jury returned a guilty verdict at 3:22 a.m. The appellate court held that the trial court had not improperly coerced the verdict.

In *United States ex rel. Latimore v. Sielaff* (7th Cir. 1977), 561 F.2d 691, *cert. denied* (1978), 434 U.S. 1076, 55 L. Ed. 2d 782, 98 S. Ct. 1266, the Federal court of appeals was called upon to consider the same case in a *habeas corpus* proceeding to determine whether the trial judge had violated defendant's constitutional right to trial by jury. The court stated that requiring a jury to deliberate into the early morning hours did not amount to improper coercion as a matter of law. The court upheld the convictions, stating:

> " 'In the absence of any expression from the jury that fatigue was interfering with the progress of the deliberations, the late hour at which they returned the verdict does not create any inference that one or more of them might have surrendered conscientious views to arrive at the verdict.' " 561 F.2d 691, 697.

■ We conclude that the same result should be reached here. As in *Latimore*, there was no expression from the jurors that they were too tired to continue deliberating. Moreover, the supplemental instruction given by the court informed them, among other things, "[t]hat no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict." When the guilty verdict

was returned, the jurors were polled, and each confirmed the verdict as his. The trial judge, who had an opportunity to view the jurors when he sent them back for further deliberations at 12:30 a.m., was in a better position than this court to assess their condition. Under the circumstances, we can find no abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

HOPF and STROUSE, JJ., concur.