PATRICIA L. BIRCH, Ex'x of the Estate of Charles P. Birch, Deceased, Plaintiff-Appellant, v. THE TOWNSHIP OF DRUMMER *et al.*, Defendants-Appellees.

Fourth District   No. 4—85—0204

Opinion filed December 31, 1985.

398

Michael R. Cornyn, of Allen & Korkowski & Associates, of Rantoul, for appellant.

Hurshal C. Tummelson, of Phebus, Tummelson, Bryan & Knox, of Urbana, for appellees.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

The plaintiff, Patricia L. Birch, brought this negligence action as executrix of the estate of Charles Birch against the township of Drummer and its highway commissioner, Robert Bell. The plaintiff alleged the defendants had been negligent in failing to warn the decedent of a dangerous condition of their roadway, but a jury returned a verdict in the defendants' favor. On appeal, the plaintiff contends: (1) The jury's verdict is not supported by the evidence; (2) the trial

court erred in instructing the jury under section 11—601(a) of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 11—601(a)); (3) the trial court erred in admitting an inventory of township road signs; and (4) juror misconduct requires reversal.

This case involves an almost head-on collision between automobiles driven by Charles Birch and George Kath. Birch died as a result of injuries received in the accident. The accident occurred on Road 550 North near its intersection with Road 200 East in Ford County. At trial, Kath testified he had driven from Bloomington to Paxton along Road 550 North in the morning of August 21, 1980. At about 8 p.m., he was returning to Bloomington along the same route. Traffic was light, the road was dry, and the weather was clear. Kath did not need his headlights. He was driving at 50 to 55 miles per hour. Kath saw a car heading directly at him just seconds before his car collided with it. He estimated the distance between the cars to be 150 to 200 feet at that point. Kath recalled driving up a slight hill just before the collision. When he saw the other car, Kath applied his brakes and steered right so that his right tires were off the road. Kath recalled seeing an intersection when he stepped on the brake. He did not remember seeing any signs along the road warning of the intersection. Kath also did not recall a jog in the road, nor was he expecting one. Kath could not estimate the speed of the other car, nor could he tell whether it had slowed prior to the accident.

Vail Moore, a civil engineer, prepared a plan and profile of the collision site. He testified the crest of a hill was 50 feet west of the intersection, which was about nine inches lower. Road 550 North was 19 feet wide except for 60 to 65 feet around the intersection, where it was slightly wider. The center of Road 550 North moved nine feet to the south over a distance of 125 feet. This "jog" in the road centered on the intersection. Over the 125 feet, there was a change in elevation of about three feet.

Deputy Sheriff Thomas Duffy was the first officer to arrive at the accident scene. Duffy saw Kath's car sitting in a ditch about two to three feet from the edge of the road. The decedent's car was in the eastbound lane facing west. Duffy determined the point of impact to be in the westbound lane. Duffy also noticed 35- to 40-foot skid marks from the decedent's car, which had been heading east. Kath's car, which had been heading west, left about 20-foot skid marks. In Duffy's opinion, both drivers were in their proper lane of travel before they began to brake. Duffy did not make an accident report because another officer had been dispatched to do so. Duffy stated he made no notes of his investigation and filed no report concerning it.

Duffy also identified photographs taken by a newspaper reporter of the scene that evening.

Defendant Bell testified he had authority to request new road signs to be installed. Bell testified there were standard intersection signs 750 feet from each side of the intersection. Nothing about those signs would indicate anything other than a straight-through intersection. The eastbound driver would also see a hill sign before he came to the hill. Bell testified a sign warning of the jog would cost about $40. Bell believed 55 miles per hour was a safe speed to travel through the intersection. He, however, admitted a test had been performed which showed 45 miles per hour was the safe speed. He also stated the eastbound driver would not see the jog in the road until he was 50 to 60 feet from it.

John Baerwald, a doctor of philosophy with specialization in civil and traffic engineering, testified as an expert witness for the plaintiff. Baerwald testified stopping sight distance refers to the distance necessary for a driver to see a six-inch object on the pavement ahead of him and be able to stop before hitting it. On Road 550 North, Baerwald testified the stopping sight distance was 200 feet. According to standards adopted in Illinois, the safe speed for such a distance is 30 miles per hour. For a speed of 55 miles per hour, the safe stopping sight distance is 425 feet.

In Baerwald's opinion, Road 550 North was inadequately signed as of the time of the crash. First, an advisory speed limit of 30 miles per hour should have been posted around the intersection. Also, the intersection sign posted would not have indicated the offset in the road and would have misled motorists. Finally, Chevron signs on each side of the intersection should have been posted to direct the motorist to move to the right.

Baerwald testified the jog in the intersection in close proximity to the crest of the hill created a possibly dangerous situation. He was of the opinion that the inadequate signing had contributed to the crash. Baerwald testified that drivers have a reaction time between 1 and 2½ seconds. He also testified a car travels about 73 feet per second at 50 miles per hour.

The plaintiff testified her husband drove regularly from Ludlow to Bloomington and back again for about one year. He normally drove on Route 9, but she knew Route 9 had been closed prior to her husband's death. She did not know how many times her husband had driven on Road 550 North.

Deputy Sheriff Andrew Miller had investigated the accident and had prepared an accident report. Prior to becoming a deputy sheriff,

Miller had been an assistant superintendent of highways for Ford County for 12 years. Miller testified the area near the collision was generally hilly. He knew of no prior accidents near that intersection. Miller measured skid marks from the westbound vehicle, which were 36 feet long. He looked for but did not see any skid marks from the eastbound vehicle. On cross-examination, he testified that a photograph taken of the accident scene showed what appeared to be skid marks made by the eastbound vehicle. Those marks came across the road, rather than going straight down the road. Miller was of the opinion that both vehicles were out of their lanes of traffic at the point of impact. The point of impact was four feet from the edge of the road in the westbound lane, but part of the westbound car would have also been over the center line.

Charles Danner, a civil engineer, testified as an expert witness on the defendant's behalf. Danner had also prepared a plan and profile of the accident site. Danner testified a car could see an oncoming vehicle from about 360 feet away. The first thing visible would be everything on a standard automobile above the driver's eyes, which are normally three feet nine inches above the ground. Danner calculated the stopping sight distance to be 250 feet on Road 550 North. He testified the recommended speed for that distance is between 35 and 45 miles per hour. For 55 miles per hour, a stopping sight distance of 400 feet is recommended. Danner testified that if the jog was a contributing factor to the accident at all, "it would be a very, very minor one."

John Mitchell, a civil engineer, was superintendent of highways for Ford County. Mitchell had never heard of any accidents at that intersection. Mitchell testified he relied on the Manual on Uniform Traffic Control Devices for Streets and Highways issued by the State's Department of Transportation. The manual stated warning signs should be kept at a minimum because too many signs breed disrespect for the signs. The manual also stated a special sign should not be used when a standard one will serve the purpose. Mitchell testified the special sign recommended by Baerwald for the intersection would not have been appropriate because it indicated a sharp turn in the intersection, whereas Road 550 North was a gentle curve through the intersection. Mitchell testified the standard crossroad sign would be appropriate. The manual also indicated intersection signs were permissive or advisory rather than mandatory.

Mitchell testified Road 550 North was a township road used primarily for local traffic. In 1973, the road had a traffic count of 150 cars per day, and in 1980, it was 175 cars per day. Mitchell testified

Route 9 had been closed during most of the summer of 1980. In Mitchell's opinion, the existing signs were adequate for the conditions at the intersection. Mitchell also testified he had hired independent engineers to do a study of township roads in Ford County prior to August 21, 1980. Mitchell produced a report and identified it as being prepared by Jerry Lacey and Associates, identified as to defendant's exhibit No. 6 and dated May 23, 1980. Mitchell testified that as he read the report, it indicated the signs at the intersection were the correct ones.

On cross-examination, Mitchell testified the survey did not involve measuring stopping sight distances and that no plans or profiles were done on the roads to determine whether speed limits were adequate. Mitchell also testified that after the accident a reverse curve sign and a 45-miles per hour plate were installed. He testified these signs were put up because the road commissioner had received pressure from several residents of the community who thought something should be done. He testified that he had performed a test to determine the proper speed limit around the curve, and the test showed that 45 miles per hour was proper.

Bell testified that in his opinion the existing signs were adequate for the conditions at the intersection. He had seen those signs just after the accident and testified that although they were slightly faded they were visible to the drivers. Bell testified that after the accident, the signs had been changed because several people had traveled that road and had asked them to "guide them around the corner a little bit safer." He testified there had never been any accidents at the intersection prior to this one.

■ The plaintiff maintains the jury's verdict is not supported by the evidence. She contends the trial court should have entered judgment *n.o.v.* or, in the alternative, granted a new trial. The standards relating to judgments *n.o.v.* and to new trials differ slightly. Verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in an aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) On a motion for a new trial, a court will weigh the evidence, set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32.

The plaintiff asserts the defendants were negligent in not posting an advisory speed limit, in misleading motorists by use of the stand-

ard intersection sign, and in failing to warn motorists of the jog in the road. The plaintiff's theory of the case is that each driver was originally in his proper lane of travel. Neither was familiar with the road, and both would have assumed from the intersection sign that the road was straight. Due to the crest of the hill, neither driver could see the jog in the road. When they first saw each other, each would have assumed the other was in the wrong lane. Both of them applied their brakes, but the decedent either lost control of his car or intentionally swerved left in an attempt to avoid the collision.

Had the jury accepted the plaintiff's theory, it did not follow that the defendants were necessarily liable. The court instructed the jury that neither a local public entity nor a public employee is liable for the failure to provide traffic warning signs unless such signs were necessary to warn of a condition which endangered the safe movement of traffic and which was not reasonably apparent to or anticipated by a person in the exercise of due care. (Ill. Rev. Stat. 1979, ch. 85, par. 3—104(b).) From the evidence, the jury could have decided that either or both drivers had not been exercising due care prior to the accident. The jury may simply have concluded the roadway conditions posed no hidden danger to drivers exercising due care.

Much of the plaintiff's case was directed at the failure to post an advisory speed limit. She contends both drivers could have traveled 55 miles per hour because no limit was posted. The plaintiff asserts 55 miles per hour was an unsafe speed because of an inadequate stopping sight distance. The hill limited the available stopping sight distance. It should have been apparent to both drivers. Furthermore, the jury was instructed under section 11—601(a) of the Illinois Vehicle Code, which provides:

"No vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway, or endangers the safety of any person or property. The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions. Speed must be decreased as may be necessary to avoid colliding with any person or vehicle on or entering the high-

way in compliance with legal requirements and the duty of all persons to use due care." Ill. Rev. Stat. 1979, ch. 95½, par. 11—601(a).

■ The plaintiff contends the trial court erred in instructing the jury under section 11—601(a) because no evidence indicated the decedent had been speeding. The statute, however, does not address driving over the maximum limit; rather, it imposes a duty on drivers to decrease their speed even when driving under the maximum limit. A person can be driving under the speed limit and still be driving too fast for conditions. (*Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624.) The evidence of the hill, the intersection, the skid marks from both vehicles, and Kath's testimony concerning his own speed provided support for the instruction.

■ The plaintiff contends the lack of notice of the jog caused the accident. She argues the standard intersection sign misled the drivers. Kath, however, testified he never noticed any sign, and there was no evidence showing that the decedent relied on the sign. From the evidence, the jury could have concluded that the decedent should have been familiar with Road 550 North. Danner testified the two drivers should have been able to see each other when they were 360 feet apart. The jury could have concluded the jog posed no danger to drivers who had properly reduced their speed when approaching the hill and intersection. Additionally, Kath, who had traveled through the majority of the jog before the collision, was able to control his car and move to the right. The decedent, on the other hand, had just reached the start of the jog when the collision occurred. He moved left while the jog itself went right. Finally, Danner was of the opinion that the jog had probably not contributed to the accident.

■■ We find ample support for the jury's verdict. Mitchell testified the existing signs were adequate for the road conditions. The plaintiff now asserts Mitchell was not an expert but she never questioned his qualifications at trial. Although Mitchell had not specialized in traffic engineering, he was a civil engineer with years of experience as superintendent of highways. The plaintiff asserts Mitchell's admission that a 45-miles per hour advisory speed limit sign and a reverse curve sign were later posted discredited his other testimony. A post-occurrence change is generally not probative of prior negligence because later carefulness does not necessarily imply prior negligence. (*Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.) The plaintiff argues that while the post-occurrence change was not evidence of prior negligence, it did serve to impeach Mitchell's testimony concerning the adequacy of the existing

signs. Mitchell, however, never testified the new signs were installed because the earlier ones were inadequate. The new signs were posted to appease members of the community who wanted the intersection made "a little bit safer."

Besides Mitchell's opinion, there was testimony that the existing signs complied with the State regulations. Mitchell, Bell, and Miller testified no other accidents had ever occurred at that intersection. Evidence of the absence of prior accidents is relevant to show that a condition was in fact not hazardous. (*Gallick v. Novotney* (1984), 124 Ill. App. 3d 756, 464 N.E.2d 846.) After carefully reviewing the evidence, we find the trial court properly denied the plaintiff's motions for judgment *n.o.v.* and for a new trial.

The plaintiff argues the trial court erred in admitting into evidence an inventory of township road signs prepared prior to the accident. Mitchell testified he had hired John Lacey and Associates to perform a safety survey of all county roads. According to Mitchell, the purpose of the survey was to review all traffic signs within the county and determine where additional signs were needed. A map of Drummer Township, showing the location of all traffic signs and indicating which needed to be relocated, replaced or added, was admitted into evidence. The exhibit indicated the signs near the accident site needed to be replaced, but none needed to be added.

The plaintiff maintains the defendants were able to present evidence through the exhibit and Mitchell's testimony that an independent engineering firm had found the existing traffic signs to be adequate for the road conditions. She asserts the exhibit was inadmissible as hearsay. The defendants contend the exhibit was a business record. Supreme Court Rule 236(a) provides a record of an act or other transaction shall be admissible as evidence of the act or transaction if made in the regular course of business and if it was the regular course of business to make such a memorandum of the act or transaction. All other circumstances concerning the making of the record affect the weight of the evidence but not its admissibility. (87 Ill. 2d R. 236(a).) The rationale for the rule rests on the notion that in carrying on the proper transaction of business, such records are useless unless accurate. The motive to follow a routine of accuracy, therefore, is great, while the motive to falsify is nonexistent. The records can be either those of a party or of a third person. The modern trend necessarily tends to be more liberal in the admission of business records as business becomes more complex. Cleary & Graham, Handbook of Illinois Evidence sec. 803.10, at 567 (4th ed. 1984).

■ The business-record exception to the hearsay rule depends upon a routine of accuracy. A record made in response to an act which has never previously occurred, however, may still qualify so long as it was made in the regular course of business. (Cleary & Graham, Handbook of Illinois Evidence sec. 803.10, at 573-74 (4th ed. 1984); *Newark Electronics Corp. v. City of Chicago* (1970), 130 Ill. App. 2d 1021, 264 N.E.2d 868.) Mitchell testified he had hired the engineering firm specifically to perform the safety study. The firm prepared a report for each township and a series for the county as a whole. The plaintiff also notes the exhibit indicates the Lacey firm's opinion, but Rule 236(a) does not bar the admission of business records because they contain opinions. That fact constitutes one of the other circumstances which may only affect the weight of the evidence. *People ex rel. Schacht v. Main Insurance Co.* (1984), 122 Ill. App. 3d 826, 462 N.E.2d 670.

■ The plaintiff complains because Mitchell was not associated with the business which prepared the exhibit. The engineering firm, however, prepared the record in question at Mitchell's direction for use in the county's business. A witness may produce business records for admission into evidence even if he is not the original entrant. Anyone familiar with the business and procedure may testify as to the records. (*Thomas v. Police Board* (1980), 90 Ill. App. 3d 1101, 414 N.E.2d 11; *Central Steel & Wire Co. v. Coating Research Corp.* (1977), 53 Ill. App. 3d 943, 369 N.E.2d 140.) We see no difference between this particular report and an audit or inventory report prepared at the request of one business organization by another. The report was useless unless accurate. We also note the report had been prepared approximately three months prior to the accident. Thus, the motive to falsify was nonexistent.

■ The plaintiff complains because she could not question Lacey as to his qualifications. She points out the trial court's refusal to allow the defendants to call Lacey as a witness because he had not been disclosed as an expert prior to trial. The plaintiff argues the defendant succeeded in getting Lacey's testimony into evidence through the "back door." Although Lacey had not been disclosed as a witness, the report, which identified Lacey's firm, had been disclosed. Nothing prevented the plaintiff from calling Lacey as a witness to question him about his qualifications. The plaintiff also notes Mitchell testified the study did not address speed limits or measure stopping sight distance. These matters simply went to the weight accorded the evidence.

At the hearing on the post-trial motion, the trial court stated:

"It is always difficult to know why a jury does what they do. After a jury calendar is over, the jury is discharged, I always try to talk to some of the jurors who are on some of the cases and find out why they did what they did. I talked to a juror here who made an interesting comment that, 'Well, we all though the Plaintiff should have had something but not anywhere near what the Plaintiff's lawyer was asking for.'

\* \* \*

Ultimately, apparently what the verdict went off on was the fact that—You will recall we came to the conclusion of the evidence one evening and we sent the jury home for the night and we had a jury instruction conference, and the next morning we had closing arguments and instructions and deliberations. At least that's my recollection of how the trial broke off that evening. At any rate, that evening two of the jurors went out to the scene and inspected the curve and came back and persuaded the other ten jurors there was nothing dangerous about that intersection. Apparently that's what the verdict went off on, the inspection, which was not in evidence, by two of the jurors who were persuading the other ten jurors that it was not a dangerous intersection.

It's troublesome that two jurors would go do that. I did not admonish the jurors not to go to the scene. I am always a little hesitant to admonish jurors not to do something \*\*\*. And, in fact, the juror I talked to said, 'Oh, yeah! If you told us not to go out there, then all twelve of us would have gone because the other ten of us were kicking ourselves for not having the foresight to go out there and look at the scene.' "

Initially, we wish to state that we do not approve of the trial court's practice of talking with jurors about the case before ruling on the post-trial motion. We also note that while the trial court never directed the jurors not to visit the accident scene, the court did instruct the jury to consider only evidence which had been presented in court.

■■ ■ Generally, a jury's verdict cannot be impeached by the testimony of the jurors. A juror, however, can testify as to whether extraneous, prejudicial information was brought to the jury's attention or whether an outside influence was improperly brought to bear upon any juror. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) Not every instance in which extraneous or unauthorized information reaches the jury results in reversible error. Only when the losing party suffers prejudice is reversal required. (*People v. Palmer*

(1984), 125 Ill. App. 3d 703, 466 N.E.2d 640.) On the other hand, the losing party need not prove actual prejudice. That party need only show that the unauthorized information relates directly to an issue in the case and may have improperly influenced the verdict. (*Frede v. Downs* (1981), 101 Ill. App. 3d 812, 428 N.E.2d 1035; *Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 386 N.E.2d 134.) The burden is then placed on the prevailing party to demonstrate that "no injury or prejudice resulted." 68 Ill. App. 3d 236, 242, 386 N.E.2d 134, 139.

In *Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 378 N.E.2d 757, the trial court refused to consider a juror's affidavit which stated one or more of the other jurors had gone to the spot from which a defense witness claimed to have viewed the accident. The appellate court remanded the cause to the trial court for an evidentiary hearing to determine whether the jury had in fact considered extraneous, prejudicial information. On remand, the trial court found no evidence of any juror misconduct, but the appellate court reversed this finding. (*Brown v. Johnson* (1981), 92 Ill. App. 3d 1095, 416 N.E.2d 799.) The court decided the evidence indicated one of the jurors had visited the accident site and viewed the scene from the vantage point of a key witness. The court held the physical characteristics of the scene were vital to the jury's understanding of the events which had transpired, and the parties had presented conflicting evidence on the issue. Moreover, the plaintiff alleged the accident scene had materially and substantially changed between the date of the occurrence and the trial. Under these circumstances, the court held any unsupervised visit was presumptively prejudicial.

Unlike *Brown*, the plaintiff here does not allege the intersection had changed since the accident. Both parties presented their own plan and profile of the intersection and a number of photographs of the accident scene. A verdict in a civil case ordinarily need not be set aside because the jurors made an unauthorized visit to the scene of an accident where the visit disclosed nothing about the location not accurately depicted by photographs, maps, diagrams, or the like lawfully admitted into evidence. (Annot., 11 A.L.R.3d 918, 945 (1967).) When maps and photographs lawfully admitted into evidence correctly depict the area, the prevailing party has met his burden of proving the lack of prejudice. (*Newton v. Minneapolis Street Ry. Co.* (1932), 186 Minn. 439, 243 N.W. 684.) We recognize that, unlike most accident cases, the physical characteristics of the accident scene were crucial to the outcome of the case. The parties, however, did not dispute these characteristics. They disagreed only on the conclusions to be drawn from the evidence.

■■ More importantly, we find the plaintiff failed to preserve the issue for review. In all of the previous cases cited, the record contained evidence by way of affidavits or testimony from jurors proving the misconduct had in fact occurred. In the present case, we have only the trial judge's statement relating what a juror had told him. The allowance of a new trial cannot be based upon the trial court's own extrajudicial investigation.

"The rights of litigants in a court of record cannot be left to the mercy of private remarks in the judge's ear." *Loucks v. Pierce* (1950), 341 Ill. App. 253, 256, 93 N.E.2d 372, 374.

The plaintiff asserts making a more complete record would have been difficult and futile. She contends the trial court already had the information concerning the misconduct and still denied the motion. The court had only an unsworn account from a single juror. The plaintiff contends she had no way of getting the court to disclose the name of that juror. The plaintiff, however, never even asked the judge. Moreover, she certainly knew the names of all the jurors. The plaintiff notes she requested directions from the trial court when she amended her motion for a new trial. The court properly refused this request. A trial judge is not in a position to advise a party on how to proceed with the litigation. The plaintiff still could have obtained affidavits from the jurors or asked leave to present testimony. The court informed counsel of the juror's remarks on January 4. The plaintiff amended her post-trial motion on January 16. The motion was denied on March 1. Throughout this time, the plaintiff failed to present any evidence to substantiate the juror's remarks. By failing to present competent evidence of juror misconduct, the plaintiff waived the issue.

For these reasons, the judgment of the trial court is affirmed.

Affirmed.

GREEN and TRAPP, JJ., concur.