THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES MORROW, Defendant-Appellant.

First District (2nd Division)   No. 1—92—1827

Opinion filed November 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Michaela J. Kalisiak, Assistant Public Defender, of counsel), for the appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

In the afternoon of October 31, 1989, two armed men robbed the family-owned Jalisco Food Market in Chicago while two other men stood watch outside. Sofia Medina and her mother, Aida, were working in the store at the time of the robbery; Sofia was in the front of the store at the cash register and Aida was in the rear at the meat counter. No customers were present. Sofia recognized the men as

they entered because they had made some purchases earlier in the day. One of the men, whom Sofia identified as defendant, went to the back of the store and held a "long gun" on Aida. He was about 10 feet away from Sofia. The other man, who was also armed, demanded money from Sofia, and she gave him about $50 from the cash register. Both men fired shots in the air before exiting the store; they then fled along with the two other men who had stood outside.

The next day, the police arrested defendant at his home and seized several guns and some shells they found in a search of the house. Defendant was charged with armed robbery and unlawful use of weapons, but the State subsequently nol-prossed the unlawful use of weapons charge. That same day, Sofia identified defendant in a lineup; Aida, however, was unable to identify anyone in the lineup. Sofia testified at trial, where she again identified defendant.

Defendant attempted to establish an alibi by introducing into evidence two documents purporting to show that he was working as a cook at a Bakers Square restaurant from noon until 11 p.m. on the day of the robbery. The first document was a photocopy of a "recap slip." James Carrington, a store manager, testified that Bakers Square utilized an NCR computer system for keeping track of employees' hours. Each employee punches in his or her social security number, job code and employee number, and the computer generates a receipt, *i.e.*, the recap slip, displaying the employee's name, number, the date, starting and ending times, and the total hours worked. This information is stored in a computer at the restaurant and at the company's parent corporation in Denver, until it is discarded. Carrington, who did not work at the restaurant where defendant was employed at the time of the robbery, had no personal knowledge that the person who caused the recap slip to be made had any knowledge of the facts contained in it; nor did Carrington have any personal knowledge of how the recap slip was generated.

The trial court sustained the State's objection to admitting the recap slip into evidence. Defendant argued that the slip qualified as a business record and was therefore admissible as an exception to the rule against hearsay. The court disagreed, noting that Carrington had no personal knowledge of the events recorded therein and that he was not a supervisor of the person who made the record. Because defendant failed to establish the unavailability of a witness with personal knowledge of how the slip was generated and its contents, the court held that the document lacked an adequate foundation. Defendant withdrew the exhibit, reserving the right to reintroduce it.

Defendant later made a formal offer of proof outside the jury's presence regarding a photocopy of a shift operations checklist pre-

pared on October 31, 1989, indicating that a "James" worked that day from noon until closing. Carrington testified that generally store managers filled out such forms in the normal course of business at Bakers Square. He further testified that managers kept the checklists for varying lengths of time and then stored or discarded them. The State, in arguing against the admissibility of the checklist, informed the court that in response to its subpoena requesting all of defendant's employment records, Bakers Square's parent corporation indicated that all employee records dating from before January 1, 1991, had been destroyed. Defense counsel explained that he had received the photocopy of the checklist from defendant, who had obtained it from a former store manager.

Defendant also made an offer of proof regarding the testimony of Robert Carbello, manager of the store where defendant worked at the time of the robbery, who would have testified that defendant was the only "James" working at the restaurant at the time the checklist was prepared. However, Carbello would have been unable to testify that he personally remembered defendant's having worked in the restaurant on October 31, nor could he recall scheduling defendant to work on that day. After the judge concluded that Carbello's testimony would be of no assistance to defendant in laying a foundation for the documents, defendant declined to call Carbello to testify.

Still outside the jury's presence, defendant tried to reintroduce the recap slip and again questioned Carrington, who stated that the first time he saw the slip was when defendant showed it to him. The trial court again refused to admit the recap slip and ruled that the operations checklist was also inadmissible, noting that both came from defendant, not the corporation, and defendant had ample motive to alter them. In the court's view, defendant failed to lay the requisite foundation for either document.

On the second day of trial, a juror informed the court that she had received six hang-up phone calls between the previous evening and that morning. When the trial court questioned her *in camera*, she stated that she was convinced the calls were related to the trial because, during *voir dire*, she revealed the name of the suburb where she lived and she was the only person in that suburb with her last name. Additionally, she had never before received such a pattern of calls. She further informed the court that she told other members of the jury about the calls; one juror stated the calls could have been merely coincidental, and another juror told her to tell the judge. After she indicated to the judge that she could no longer be impartial, he discharged her. The court subsequently polled the jury at

defendant's request, asking each individually whether he or she had any conversations with the discharged juror and, if so, whether that would have any impact on his or her ability to be fair and impartial. Seven jurors had heard about the calls from the discharged juror and two others were vaguely aware that the juror had been discharged. All of the jurors, including those who heard about the calls and knew of the juror's discharge, stated that they could be fair and impartial. Defendant moved for a mistrial, arguing that the jury was tainted, but the court denied the motion.

The court revoked defendant's bond after interviewing the juror. The court felt that there was sufficient evidence to draw an inference that defendant made the calls, or caused them to be made, despite defense counsel's assurance that defendant had been with him during all of the previous evening.

Defendant testified at trial that he began work in the afternoon, starting before 2 p.m., until about 11 p.m. on the day of the robbery. However, when questioned by police on November 1, he had told them he was on his way to work at the time of the robbery. Defendant was not questioned regarding the inconsistency apparent from the statements he made on the day after the robbery and the documents he had attempted to have admitted into evidence which indicated he began work at noon. He also testified that he placed in his bedroom the live shells that the police found. The shells matched a spent shell found at the scene. He denied any knowledge of how the guns got into his basement.

After the jury found the defendant guilty of armed robbery, the court sentenced him to 10 years in the custody of the Illinois Department of Corrections. Defendant filed a post-trial motion for a new trial which the court denied. He now appeals.

We first examine defendant's contention that the recap slip and operations checklist fulfilled the statutory requirements to qualify as business records and, therefore, should have been admitted into evidence. Like other evidentiary rulings, the determination of whether or not business records are admissible is within the sound discretion of the trial judge, and such determinations will not be reversed absent an abuse of discretion. *People v. Tsombanidis* (1992), 235 Ill. App. 3d 823, 833, 601 N.E.2d 1124, 1131; *People v. Boclair* (1989), 129 Ill. 2d 458, 476-77, 544 N.E.2d 715, 723.

The Code of Criminal Procedure of 1963 provides:

"Any writing or record *** made as a memorandum or record of any act *** shall be admissible as evidence of such act *** if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act *** or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility." Ill. Rev. Stat. 1987, ch. 38, par. 115—5(a).[1]

The proponent of a business record who seeks its admission into evidence must lay an adequate foundation therefor, which includes: a showing that the record was made as a memorandum or record of the act; the record was made in the regular course of business; and that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter. (*Tsombanidis*, 235 Ill. App. 3d at 835, 601 N.E.2d at 1132.) In the case of computer-generated records, a proper foundation additionally requires a showing that: standard equipment was used; the particular computer generates accurate records when used appropriately; the computer was used appropriately; and the sources of the information, the method of recording utilized, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence. (*Riley v. Jones Brothers Construction Co.* (1990), 198 Ill. App. 3d 822, 829, 556 N.E.2d 602, 606; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 654-55 (5th ed. 1990).) Anyone familiar with the business and its procedures may testify as to business records, and the original entrant need not be a witness (see Ill. Rev. Stat. 1987, ch. 38, par. 115—5(a)); the foundation requirement establishes the indicia of reliability necessary for admission of the records. *People v. Shiflet* (1984), 125 Ill. App. 3d 161, 180-81, 465 N.E.2d 942, 955-56.

The rationale underlying the admissibility of business records is the recognition that businesses are motivated to keep routinely accurate records and that they are unlikely to falsify records kept in the ordinary course of business and upon which they depend. (*Birch v. Township of Drummer* (1985), 139 Ill. App. 3d 397, 407, 487 N.E.2d 798, 806.) However, the credibility of a business record "depends on the regular, prompt, and systematic nature of the entry and the fact that it is relied on in the operation of the business." *Tsombanidis*, 235 Ill. App. 3d at 835, 601 N.E.2d at 1132.

■ Defendant in the present case fulfilled some of the requirements for establishing that the recap slip and operations checklists were admissible business records. Carrington, an experienced manager familiar with Bakers Square's business practices, testified

---

[1]Supreme Court Rule 236 contains a substantially identical provision applicable in civil cases. 134 Ill. 2d R. 236.

that the computer-generated time-keeping procedures at the restaurant were standard and reliable. He also testified that Bakers Square utilized recap slips and operations checklists in the ordinary course of business.

However, defendant failed to "clothe this evidence with sufficient *indicia* of reliability and trustworthiness" to justify its admission. (*Shiflet,* 125 Ill. App. 3d at 181, 465 N.E.2d at 956.) As the trial court stated in ruling against the admissibility of the recap slip, "[h]ere we have a photocopy, not the document but a copy of the document. The document that was not in the possession of the company but was in the possession of the defendant so he was free to alter it and photocopy the altered document." Defendant maintains that because the absence of the original was explained by the parent company's destruction of all relevant employee records, the document was admissible as a business record and under the original writing, or best evidence, rule. The original writing rule expresses a preference for the original writing when the proponent seeks to prove the contents of that writing. However, our examination of the record leads us to the conclusion that defendant misconstrues the trial court's analysis. The court rejected the proffered document not because it was a photocopy, but because it was in defendant's possession for an unknown length of time and, unlike his employer, he had a motive to falsify it and submit a photocopy of the falsified record. Furthermore, defendant presented no witness to testify that he or she had personal knowledge that the documents at issue were generated in the normal course of business.

Defendant further argues that the statute on business records mandated the court to admit the documents and to allow the jury to determine what weight to accord them. (Ill. Rev. Stat. 1987, ch. 38, par. 115—5(a).) Defendant points to the provision stating that "[a]ll other circumstances *** shall not affect its admissibility," but he ignores the preceding provisions. By the terms of the statute, the foundation for the record must first be established before the "all other circumstances" provision comes into play; the initial provision sets forth the threshold foundation requirements which defendant failed to meet. He did not show that the documents in his possession were made in the regular course of business.

The cases defendant relies on do not support his position. For example, in *In re T.D.* (1983), 115 Ill. App. 3d 872, 450 N.E.2d 455, a minor appealed his adjudication of wardship following a trial court's finding that he illegally sniffed glue. A police officer testified and read the ingredients label on the tube of glue. The defendant objected that the label was inadmissible hearsay. The State argued that the

label was either a business record or independently admissible real evidence. Defendant correctly asserts that the *T.D.* court stated that business records are admissible absent testimony from the original entrant or one with knowledge of the event itself. But defendant fails to note that the *T.D.* court ultimately held that the label was inadmissible as a business record because the State failed to lay the necessary foundation therefor. The State presented no evidence that the label was made in the regular course of business. *T.D.*, 115 Ill. App. 3d at 876, 450 N.E.2d at 458.

In *Birch*, another case upon which defendant relies, the plaintiff's decedent was killed in a car accident. The plaintiff contended that the township defendant was negligent in failing to provide adequate warning signs in the areas of the accident. (*Birch*, 139 Ill. App. 3d at 399, 487 N.E.2d at 801.) The plaintiff appealed a jury verdict in the defendant's favor, arguing that the trial court erroneously admitted into evidence an inventory of road signs prepared by an independent company as part of a safety survey which had indicated that there was an adequate number of signs in the area. The defendant presented the exhibit through one of its employees and the plaintiff objected that it was inadmissible hearsay. We agreed with the defendant that the inventory was a business record, made in the regular course of business, and that it was the regular course of business to make such a record. We noted also that the survey was prepared three months before the accident when the defendant had no motive to alter it. *Birch*, 139 Ill. App. 3d at 407, 487 N.E.2d at 806.

Defendant cannot claim a similar absence of a motive to falsify the documents he proffered to the court. Nonetheless, he argues that the operations checklist would have verified the recap slip, thus removing any doubt about its reliability. He contends that his case is analogous to the situation in *Victory Memorial Hospital v. Rice* (1986), 143 Ill. App. 3d 621, 493 N.E.2d 117. There, we reversed the trial court's refusal to admit computer-generated hospital bills into evidence because it doubted the reliability and trustworthiness of the input data. (*Victory Memorial*, 143 Ill. App. 3d at 626, 493 N.E.2d at 120-21.) We found, however, that the bills were verified by 30 slips recording laboratory tests which corresponded to the charges made on the bills. A hospital witness produced the slips, which contained five parts—four with the testing information and one with numerical data to be fed into the computer. (*Victory Memorial*, 143 Ill. App. 3d at 626, 493 N.E.2d at 120-21.) In contrast, the shift operations checklist in the present case contains the same flaw as the recap slip it was meant to verify, *i.e.*, it originated with defendant, not his employer, and he had a motive to alter its contents.

Admitting the recap slip and operations checklist would have undermined the reasoning which permits admission of business records in spite of their hearsay nature. These documents did not contain the indicia of reliability characteristic of admissible business records; therefore, we hold that the trial court did not abuse its discretion in refusing to admit the documents.

Defendant's second contention is that the trial court erred in its refusal to grant a mistrial after learning that the discharged juror had informed other jurors that she received hang-up calls.

The trial court has broad discretion in determining whether or not to grant a mistrial. Denial of a motion for a mistrial will not be grounds for reversal unless it reasonably appears that at least some of the jurors were prejudiced or influenced to such an extent that the defendant did not receive a fair trial. (*People v. Staten* (1986), 143 Ill. App. 3d 1039, 1056, 493 N.E.2d 1157, 1168; see also *Flath v. Madison Metal Services, Inc.* (1991), 212 Ill. App. 3d 367, 570 N.E.2d 1218 (upholding trial court's denial of a motion for a mistrial when the defendant failed to show prejudice resulting from the discharge of a juror who stated he could not be impartial after hearing attorneys' opening statements).) A determination of whether prejudice occurred requires an examination of all the facts and circumstances surrounding the jury's exposure to the allegedly prejudicial matter. *Staten,* 143 Ill. App. 3d at 1056-57, 493 N.E.2d at 1168.

A mistrial is not the exclusive remedy in cases where an unauthorized communication is had with a juror. If the trial court is reasonably satisfied that members of the jury can be fair and impartial, a mistrial is not necessary. For example, in *Staten,* jurors exiting the courthouse on a lunch break were confronted by a group of teenagers, one of whom yelled out that he would kill them if he had a gun. The defendant subsequently moved for a mistrial, claiming that the incident deprived him of his right to a fair and impartial jury. (*Staten,* 143 Ill. App. 3d at 1056, 493 N.E.2d at 1168-69.) The trial court denied the motion after questioning the jury individually and concluding that the threat had not affected any juror's ability to be fair. We affirmed, noting that verbal assurances of jurors are not conclusive on the issue of their impartiality, but that they should be given great weight. In light of the surrounding circumstances, including the fact that the threat came from an uninvolved person, we found no error. *Staten,* 143 Ill. App. 3d at 1057, 493 N.E.2d at 1168-69, citing *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.

We also upheld a trial court's denial of a motion for a mistrial when a juror informed the trial court *in camera* that she was concerned because the defendant knew where she worked, that her

son had had some problems with the defendant's father, and that she had told other jurors of her concerns. (*People v. Bolla* (1983), 114 Ill. App. 3d 442, 450, 448 N.E.2d 996, 1003.) The judge denied a motion to excuse her for cause. Three days later, her son's car was vandalized, and the court discharged her and sequestered the jury. The defendant argued that the trial court should have declared a mistrial because the jury could have reasonably concluded that he had some connection with the juror's discharge and the court's decision to sequester the jury. We disagreed and held that it was within the trial court's discretion to sequester the jury rather than take the more drastic step of declaring a mistrial. We also noted that the trial court was in a better position than the reviewing court to assess whether jurors were prejudiced. *Bolla*, 114 Ill. App. 3d at 450-51, 448 N.E.2d at 1003-04.

And in a case similar to the one at bar, we again upheld a trial court's denial of a motion for a mistrial when a juror was discharged after the defendant's cousin approached him at work in an intimidating manner. (*People v. Flint* (1986), 141 Ill. App. 3d 724, 731-32, 490 N.E.2d 1025, 1030.) The juror had informed other jurors of the encounter. The judge told the remaining jurors that the discharged juror worked with the defendant's relative and, as a result, may have suffered some embarrassment if he served on the jury. The judge then asked if any juror was troubled by the matter and none responded. (*Flint*, 141 Ill. App. 3d at 732, 490 N.E.2d at 1030-31.) We found that the defendant suffered no prejudice from the denial of his motion for a mistrial, noting that any possible feelings of intimidation by jurors were merely speculative. *Flint*, 141 Ill. App. 3d at 733, 490 N.E.2d at 1031.

In the present case, defendant has similarly failed to show that he was prejudiced by the trial court's denial of his motion for a mistrial. Although the discharged juror told seven jurors that she received the calls, all of the jurors indicated that they could be fair. Although their assurances are not dispositive, there is no indication that the trial judge abused his discretion; the jurors could reasonably have concluded that the hang-up calls were coincidental and unrelated to the trial. That they may have surmised that defendant was involved with the calls is insufficient to provide a showing of prejudice.

Finally, defendant asserts, without analysis, that the trial court's revocation of his bond during trial prejudiced him. The State contends that the trial court acted within its authority to take measures to ensure the orderly process of trial.

Supreme Court Rule 604(c), to which neither party has directed

our attention, governs appeals of bail revocation. (134 Ill. 2d R. 604(c).) It provides that defendants "may appeal to the Appellate Court" orders "setting, modifying, revoking, denying, or refusing to modify bail" before their trial or conviction. (134 Ill. 2d R. 604(c).) Though the language is permissive, we have interpreted it as mandating an interlocutory appeal of bail orders. The only appropriate time for challenges to bail orders is when those orders are entered, not on direct appeal. *People v. Saunders* (1984), 122 Ill. App. 3d 922, 461 N.E.2d 1006 (holding that the interlocutory appeal remedy provided by supreme court rule is a defendant's sole avenue for challenging bail orders); *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239 (holding that the trial court's refusal to reduce bail pending trial was appealable under Supreme Court Rule 604(c) at the time it was entered, thus precluding consideration on appeal).

Assuming *arguendo* that it is proper for us to examine the merits of defendant's assertion of prejudice, we conclude that he could not prevail. A trial court may revoke bail as a means of managing trial proceedings, and bail revocation is an appropriate mechanism to prevent defendants from interfering with witnesses or jurors. (*People ex rel. Hemingway v. Elrod* (1975), 60 Ill. 2d 74, 79-80, 322 N.E.2d 837, 840-41; see also *United States v. Fernandez* (1961), 5 L. Ed. 2d 683, 686-87, 81 S. Ct. 642, 645 (upholding bail revocation of all defendants in narcotics trial even though only some of them were involved with disrupting the trial).) Trial courts may not arbitrarily revoke bail; there must be some evidence that such a measure is required. (*Elrod*, 60 Ill. 2d at 79-80, 322 N.E.2d at 840, *Fernandez*, 5 L. Ed. 2d at 686-87, 81 S. Ct. at 644-45.) Here, the trial court acted within its managerial authority in revoking defendant's bail. After interviewing the discharged juror *in camera*, the court stated that it found a strong inference that defendant was responsible for the calls. (See *People v. Cross* (1979), 77 Ill. 2d 396, 413, 396 N.E.2d 812, 820 (holding that the trial court's revocation of defendant's bond because he was late for trial was within its discretion).) In accordance with the court's written order, defendant was brought to court in civilian clothes; accordingly, since the jury had no way of knowing that his bail had been revoked, defendant could not have been prejudiced.

Finding no error in the trial court's rulings, we affirm defendant's conviction and sentence.

Affirmed.

HARTMAN and DiVITO, JJ., concur.