1998 SD 75

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Kerry Joe CHRISTENSEN, Defendant and Appellant.**

No. 20236.

Supreme Court of South Dakota.

Considered on Briefs June 1, 1998.

Decided July 8, 1998.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Mark Kadi, Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant.

AMUNDSON, Justice.

[¶ 1.] Kerry Christensen appeals his conviction for first-degree burglary. He claims the trial court erred by denying a motion for acquittal and by not excluding a photographic lineup identification, a subsequent in-court identification, and a computer printout. We affirm.

## FACTS

[¶ 2.] Christensen was convicted of first-degree burglary stemming from an incident that took place at the Ramkota Inn (Ramkota) in Sioux Falls, South Dakota, during the early morning hours of February 1, 1997. Christensen, a Ramkota security guard, was alleged to have entered a hotel room at the Ramkota and fondled a sleeping woman.

[¶ 3.] The record reflects that R.D., the alleged victim, along with her two friends, K.S. and S.H., had traveled to Sioux Falls on January 31, 1997, to participate in a trade convention. R.D. checked into her room at the Ramkota around 4:00 p.m.

[¶ 4.] Around 7:00 p.m. that evening, R.D. and her friends went to a hospitality suite at the Ramkota. R.D. testified that she consumed three or four beers at the hospitality suite, but did not feel that she was intoxicated when she left the suite at around 8:30 p.m.

[¶ 5.] R.D. and her friends then traveled to the Sioux Falls Brewery for dinner at around 9:00 p.m. During dinner she consumed a rum and coke. She then began a "drinking contest" with other people at her table. By the time she left the brewery at 11:30 p.m. to return to the hotel, she had consumed six or seven "shots" of alcoholic beverages and was admittedly intoxicated.

[¶ 6.] On the way back to the hotel, R.D. became ill and vomited at the side of the road. Upon arriving at the hotel, R.D.'s friends helped her back to her room, although they did not think she was so intoxicated that she was unable to walk by herself. Then, with the assistance of her friends, she got ready for bed. Although R.D. was intox-

icated, her friends testified that she was still capable of undressing herself.

[¶ 7.] When S.H. and K.S. left R.D.'s room later that morning, they were both quite certain that they had closed the door. They also contend they did not turn off either the bathroom light in R.D.'s room or the lamp on the nightstand next to her bed so that R.D. could see to make it to the bathroom and also see the glass of water that was left on the nightstand for her.

[¶ 8.] Before returning to her own room that morning, S.H. went to get some ice. Upon leaving R.D.'s room, S.H. saw a security guard in the hallway. He was still in the hallway when S.H. returned with the ice and later when S.H. returned to her own room for the evening. S.H. was later able to identify the security guard as the defendant, Christensen.

[¶ 9.] R.D. testified that she woke up later that morning when someone got into the bed with her and unhooked her bra. She then felt someone touch her chest and vaginal areas. When this happened, she turned her head around to see who the person was lying in bed next to her. R.D. then testified she turned back around and "froze." Then she heard the assailant leave the room. The assailant left the door slightly ajar, so R.D. got out of bed and closed the door. She attached an "extra latch safety" to the door.

[¶ 10.] S.H. came to R.D.'s room at around 7:30 that morning and noticed that R.D. was very upset. She appeared to her friends to "be in shock" and was acting in a way that her friends had previously never seen. R.D. then told her friends about the person who had come into her room and fondled her and then left when she woke up. However, R.D. stated that she did not want to report the incident because she was "embarrassed about the situation" and did not want other people to know about it. Her friends did later convince her that calling the police was the proper thing to do.

[¶ 11.] Before talking with the police, R.D. discussed this matter with Jan Grunewaldt, the Ramkota's manager. R.D. described her assailant as having dark brown hair with a thin mustache. According to Grunewaldt,

Christensen was the only male employee on duty at the time of the incident who matched the description given by the victim. Grunewaldt also called the night manager at the Ramkota, Cece Koonce, to inquire whether she had observed any strange occurrences during the time of the incident. When Koonce was told of the description of R.D.'s assailant, she stated to Grunewaldt that it matched Christensen.

[¶ 12.] Grunewaldt forwarded R.D.'s description to the police, who prepared a photo lineup that included a photograph of Christensen. Before showing the photo lineup to R.D., the police had R.D. go over her story twice. R.D. again described her assailant as a white male with dark hair and a thin mustache. She told police she was not able to describe his height or weight, since he was lying next to her underneath the covers on the bed. When shown the photo lineup, R.D. was visibly disturbed when she examined Christensen's photo. According to Detective Haney, her "eyes got wide open and she started to tremble" before pointing at Christensen's photo and identifying Christensen as the perpetrator.

[¶ 13.] One important item of evidence in the case concerned Ramkota's computerized electronic door lock system. Under this system, hotel guests use small cards with magnetic strips to enter their rooms. The use of these "keys" is also registered and recorded on Ramkota's door lock system contained within each guest's door at the hotel. This information is saved for thirty days before the system automatically erases it. A portable programmer is used to access the information that is saved by the door lock system. The information is then transferred to a regular personal computer so that it can be printed out. These printouts are not made on a daily basis at the Ramkota, but they are produced when a customer complains that someone may have entered their room. The resulting printout indicated that the bellman's key was used to enter R.D.'s room at 1:21 a.m.

[¶ 14.] Detective Haney testified that, when he questioned Christensen, he initially told Detective Haney that he did not have access to the bellman's key. Detective Haney testi-

fied that, later in the interview, Christensen admitted that he not only had access to the key, but had used it on occasion when taking items to hotel rooms. Shirley Boe, the night auditor, testified that she works in the area behind the front desk where the bellman's key is kept. She did not see Christensen take the key, although she testified that he had access to it and frequented the area where it was kept.

[¶ 15.] Detective Haney also questioned Christensen about his presence in hotel rooms the evening of the incident. At first, Christensen was adamant that he had not gone into any of the guests' rooms. According to Detective Haney, Christensen changed his story when told that police had physical evidence placing him inside R.D.'s room. Christensen then admitted that he had noticed R.D.'s door was propped open with a canvas bag, but all the lights were turned off. Christensen claimed he had taken only two or three steps into the room in order to move the bag.

[¶ 16.] Koonce, the night manager at Ramkota, testified it was standard policy that whenever an employee found a room left open and unattended it was to be reported to the night manager. Koonce could then inform the guests of this, if they came to her with concerns about their room being disturbed. Koonce testified that Christensen did not tell her he had entered R.D.'s room to move the canvas bag and close the door. Christensen maintained at trial that he was not aware of any such policy. Additional facts will be developed as they become relevant.

[¶ 17.] On August 28, 1997, a judgment of conviction was entered against Christensen after a jury found him guilty of first-degree burglary, in violation of SDCL 22–32–1(3). Christensen was sentenced to serve fourteen years in the South Dakota State Penitentiary with seven years of the sentence suspended.

[¶ 18.] Christensen appeals, raising the following issues:

1. Whether the trial court erred in concluding that the photographic lineup was not impermissibly suggestive.

2. Whether the trial court erred in failing to conclude that the in- court identification was tainted by the alleged suggestiveness of the pretrial identification procedure.

3. Whether the court erred in admitting the computer printout generated by the hotel security system.

4. Whether the evidence presented by the state was sufficient to sustain Christensen's conviction.

## STANDARD OF REVIEW

[¶ 19.] The trial court's decision to deny a motion to suppress a photographic lineup identification will not be reversed absent an abuse of discretion. *State v. Garza,* 1997 SD 54, ¶ 32, 563 N.W.2d 406, 412. Likewise, the abuse of discretion standard governs our determination of whether the trial court erred in admitting evidence under the business records exception to the hearsay rule. *State v. Brown,* 480 N.W.2d 761, 763 (S.D.1992). The abuse of discretion standard refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. *Id.* (citing *State v. Pfaff,* 456 N.W.2d 558 (S.D.1990)). On appeal, we are bound to view the evidence in a light most favorable to the verdict. *State v. Boyles,* 1997 SD 99, ¶ 18, 567 N.W.2d 856, 862 (citing *State v. Schmiedt,* 525 N.W.2d 253, 254–55 (S.D.1994); *State v. Miskimins,* 435 N.W.2d 217, 222 (S.D.1989)).

## DECISION

[¶ 20.] **1–2. Photographic Lineup Identification**

[¶ 21.] Christensen contends the trial court erred in denying his motion to suppress the photographic identification lineup. Specifically, Christensen asserts the only picture in the lineup that showed a person looking downward was the one of him. On that basis, Christensen argues he looks more guilty than the rest of the people in the pictures and that the lineup was impermissibly suggestive. Christensen also contends the subsequent in-court identification was tainted.

[¶ 22.] "The burden of establishing the impermissible suggestiveness of the photographic lineup is on the party seeking to suppress the evidence." *Garza*, 1997 SD 54 at ¶ 32, 563 N.W.2d at 412 (citing *State v. Abdo*, 518 N.W.2d 223, 225–26 (S.D.1994)). Christensen must show that the pretrial identification process was thus so suggestive, in light of the totality of the circumstances, that it led to "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410 (1972) (citation omitted). We employ a two-prong test for photographic lineups: "(1) Was the lineup impermissibly suggestive, and (2) if so, was the subsequent in-court identification tainted?" *Abdo*, 518 N.W.2d at 225 (citing *State v. Iron Thunder*, 272 N.W.2d 299, 301 (S.D.1978)).

[¶ 23.] As to the first prong, the trial court held that the lineup was not impermissibly suggestive. Detective Haney testified that the photograph of Christensen used in the lineup was obtained at the driver's license bureau along with the picture of other individuals used in the lineup with dark hair and a thin mustache. Christensen's argument about something so trivial as the position of his eyes in relation to the other individuals pictured does not rise to the level of impermissibly suggestive. *See, e.g., Garza*, 1997 SD 54, ¶ 31, 563 N.W.2d at 412 (dismissing contention of impermissible suggestiveness where description of perpetrator in white shirt matched picture of defendant in white shirt) (citing *Harris v. Clusen*, 487 F.Supp. 616, 619 (E.D.Wis.1980) (holding the photo identification was sufficiently reliable although the defendant was the only person pictured in a suit and the robbery was committed by a person in a suit); *Moore v. State*, 304 Ark. 558, 803 S.W.2d 552, 554 (1991) (holding it was not impermissibly suggestive to have the defendant pictured in clothing similar to that described by the witness); *LaBlanc v. People*, 177 Colo. 250, 493 P.2d 1089, 1091–92 (1972) (holding that a lineup with the defendant in jail clothes and all others in street clothes was not so suggestive as to violate due process); *People v. Johnson*, 43 Ill.App.3d 649, 2 Ill.Dec. 174, 357 N.E.2d 151, 158, (1976) (holding that, although the defendant was the only person without a shirt in the photo lineup, it was not unduly suggestive); *State v. Morgan*, 444 So.2d 325, 329 (La.Ct.App.1983) (holding that it was not impermissibly suggestive that the defendant was the only person in the photo lineup wearing a bandanna, when the crime was committed by a person wearing a bandanna); *State v. White*, 307 N.C. 42, 296 S.E.2d 267, 269–70 (N.C.1982) (holding that, although the assailant was described as wearing a white shirt, it was not impermissibly suggestive to have the defendant be the only person pictured in a white shirt); *compare People v. Carter*, 46 Cal.App.3d 260, 120 Cal.Rptr. 181, 185–86 (1975) (holding the photographic lineup violated due process because the sole item of identification by the witness was a turtleneck sweater, yet the defendant was the only one pictured wearing a sweater)).

[¶ 24.] The trial court reviewed the photo lineup and found it was not impermissibly suggestive. Christensen has failed to carry his burden to show that it was an abuse of discretion for the trial court to admit the photo lineup. Consequently, we need not address the second prong of the test—whether the subsequent in-court identification was tainted. *Abdo*, 518 N.W.2d at 225 (citing *Iron Thunder*, 272 N.W.2d at 301).

[¶ 25.] **3. Admissibility of Computer Printout**

[¶ 26.] The trial court admitted into evidence the computer printout generated by the hotel security system under SDCL 19–16–10, the business records exception to the hearsay rule. This statutory exception provides as follows:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, is not excluded by § 19–16–4, even though the declarant is available as a

witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this section includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. SDCL 19–16–10. " 'A trial court has broad discretion in determining the admissibility of documents such as business records.' " *Brown,* 480 N.W.2d at 763 (quoting *United States v. Wigerman,* 549 F.2d 1192, 1194 (8thCir.1977)) (other citations omitted) (alterations omitted).

[¶ 27.] Christensen contends that for the admission of computer-generated records there should be additional foundational requirements. A case involving a very similar issue is *State v. Ford,* 1 Neb.App. 575, 501 N.W.2d 318, 323 (1993). In *Ford,* a hotel porter was convicted of theft based partially on evidence that his key card was used to enter a guest's room where the theft had occurred. *Id.* 501 N.W.2d at 320. On appeal, the defendant challenged the admittance of the computerized hotel record of his entry into the room. The defendant contended that the State had failed to lay a proper foundation as to whether the computer security system was standard within the industry and whether retrieval of the information from the system occurs in a manner which indicates trustworthiness. The court held that "a specific computerized system must be shown to be reliable, but the imposition of the burden of proving industry standard is not justifiable. At this stage in the evolution of computer technology, there is no need to require proof of industry standard." *Id.* 501 N.W.2d at 322.

[¶ 28.] Christensen's reliance on *People v. Morrow,* 256 Ill.App.3d 392, 195 Ill.Dec. 86, 628 N.E.2d 550, 554 (1993), is misplaced.

Although *Morrow* does mention requirements for a proper foundation for computer-generated records in Illinois, the decision actually hinged on the reliability of the evidence. The proponent of the evidence's admission in *Morrow* had the opportunity and motive to falsify it, in addition to the lack of a witness to testify to his or her personal knowledge that the documents at issue were generated in the normal course of business. *Id.* 628 N.E.2d at 555. There is no evidence that the Ramkota or its employees had the motive or even the opportunity and ability to tamper with the computerized records in this case.[1] Furthermore, Chris Dike, the Ramkota employee in charge of downloading the information from the memory of the door lock, testified to the fact that the data was created in the normal course of business.

[¶ 29.] Christensen challenges the trustworthiness of the computerized door lock information. Comparing the information contained in the exhibit and the uncontested testimony of witnesses during the period the victim was staying at the Ramkota leads to the conclusion that the computerized information was reliable. The record reflects that R.D., along with S.H. and K.S., arrived in Sioux Falls at around 4 p.m. and checked in immediately at the Ramkota. The computer system showed that R.D. first entered her room at 3:44 p.m. The group later left to set up a display booth for the trade show which they were attending. They testified that they returned around 5:30 to 6 p.m. The computer system showed that R.D. returned to her room at 5:42 p.m. Then, the group left their rooms to enjoy a hospitality suite at the Ramkota. They testified that they returned around 8:30 to 9 p.m. to prepare to go out for dinner. The computer system showed that they returned at 8:55 p.m. Testimony of the witnesses then described their dinner and

---

1. Christensen also turns to a 1977 decision by the Eighth Circuit Court of Appeals which mentioned the need "for a more comprehensive foundation" for computerized business records because of the "complex nature of computer storage." *United States v. Scholle,* 553 F.2d 1109, 1125 (8thCir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). However, this opinion is of little help to Christensen's position. First of all, the *Scholle* decision suffers from declining persuasiveness due to its antiquated pronouncements on an issue dealing with a rapidly developing technology. Also, the decision actually upheld the inclusion of the evidence at issue in that case. *Id.* Finally, *Scholle* required "only that there be sufficient proof of [the computer program's] trustworthiness as well as an adequate opportunity for rebuttal." *Id.* There was sufficient proof of the computerized records' trustworthiness in this case, such that we do not read *Scholle* to be at odds with the admission of the evidence in this case.

drinks that night and the fact that they returned around midnight. The computer system recorded R.D.'s entry as being at 12:10 a.m. S.H. testified that she left the room to get some ice—a trip she contended lasted around 5 minutes. The computer system recorded the entry to R.D.'s room at 12:17 a.m. The evidence also showed that S.H. thought she arrived at R.D.'s room at around 7:30 the next morning. The computer system recorded an entry at 8:07 a.m. In the meantime, the computer system registered the use of the bellman's master key at 1:21 a.m. With this type of evidence in the record the trial court certainly did not abuse its discretion in concluding that the computer data was trustworthy. *See Ford,* 501 N.W.2d at 323 (finding that the entries to the guest rooms at the hotel as noted by the computer system corresponded with the testimony of the witnesses in the case, indicating the trustworthiness of the evidence).

[¶ 30.] Christensen also takes issue with Dike's qualifications to testify about the Ramkota's computerized lock system and authenticate the computer generated records. Dike was the chief custodial engineer for Ramkota and had approximately one year of experience with the security system. He testified he also had manuals for the security system to which he could refer. Christensen attacks Dike's qualifications because Dike did not have any computer science training, did not have programming experience, and did not have repair experience for computers.

[¶ 31.] A similar argument was rejected in *Ford,* where the defendant had claimed that the general manager of the hotel was not qualified to testify about the computerized lock system in place at the hotel, because she did not have a degree in computers and was unfamiliar with the computer's components. 501 N.W.2d at 321. The court held as follows:

> [The witness] explained how the computer system worked and testified that the computer instantaneously recorded the opening of every guestroom door on the property. Her testimony indicated that she was proficient at retrieving and printing out information stored in the computer system.... For purposes of foundation, it did not matter whether [the witness] could discuss the components or engineering principles of the computer. [The witness] was qualified to testify about the computer system and authenticate the system's printouts.

*Id.*

[¶ 32.] In the present case, Dike was qualified to testify about the computerized lock system at the Ramkota and could authenticate the printout from the data downloaded from the system. Dike explained how the computer system worked and testified that the computer instantaneously recorded the opening of every guest room door on the property. His testimony indicates that he was proficient at retrieving and printing out the information stored in the computer system. We hold that Dike was a "qualified witness" for purposes of admitting the evidence under SDCL 19–16–10. *See United States v. Linn,* 880 F.2d 209, 216 (9thCir.1989) (holding person to be a "qualified witness" for purposes of admitting computerized phone records even though she was not a "computer programmer.") (citations omitted).

[¶ 33.] Christensen also attacks the computerized evidence in this case, because he asserts it is not kept in the ordinary course of business. SDCL 19–16–10. It is true that the information is not stored forever. As with most business records, there comes a time when they are no longer useful for the business purpose that they were previously maintained. In this case, the information in the computerized door lock mechanisms is only stored for thirty days. However, Christensen has not shown how this relatively short period of time somehow disqualifies the information from meeting the requirements of being a business record under SDCL 19–16–10. We hold the records are "kept in the course of a regularly conducted business activity." SDCL 19–16–10.

[¶ 34.] **4. Sufficiency of the Evidence to Sustain the Conviction**

[¶ 35.] Christensen's final contention on appeal is that the evidence was insuffi-

cient to sustain his conviction. Christensen can certainly point to weaknesses in the State's case against him, but he ignores extensive evidence of his guilt. First, of all, R.D. had a good opportunity to view the criminal at the time of the crime, as he was within an arm's length of her when she looked at him. R.D.'s description of the perpetrator was of a white male with a thin mustache and dark hair—a description which fit Christensen. Also, R.D.'s photo identification took place the same day that she had viewed the perpetrator, aiding her ability to recall the details of his appearance.

[¶ 36.] Besides the eyewitness testimony of R.D., there was extensive circumstantial evidence. Christensen was on duty that night as a security guard at the Ramkota. Christensen was identified by witnesses who saw him hanging around the hallways outside of R.D.'s room. Christensen had access to the bellman's key. There was uncontroverted evidence that this key was used to enter R.D.'s door the night of the incident. Also, there was evidence that Christensen lied about his access to the bellman's key and whether he had entered R.D.'s room that night.

[¶ 37.] "It is not the proper function of this court to resolve evidentiary conflicts to determine the credibility of witnesses or weigh the evidence." *Abdo*, 518 N.W.2d at 227 (quoting *State v. Battest*, 295 N.W.2d 739, 742 (S.D.1980)). The weight of the evidence is for the jury to evaluate. *State v. Ristau*, 290 N.W.2d 487, 490 (S.D.1980). The State set forth sufficient evidence from which the jury could reasonably find Christensen guilty of the crime charged. *State v. Thompson*, 1997 SD 15, ¶ 34, 560 N.W.2d 535, 542.

[¶ 38.] Affirmed.

[¶ 39.] MILLER, C.J., and SABERS, KONENKAMP, and GILBERTSON, JJ., concur.

